FRANCES THERESA GATTA, plaintiff below, plaintiff in error, vs.
THE PHILADELPHIA, BALTIMORE AND WASHINGTON RAIL-
ROAD COMPANY, defendant below, defendant in error.

1.  NEGLIGENCE—EVIDENCE—QUESTION FOR JURY.
    Where the evidence in an action for personal injury is such that the
jury might have found defendant negligent in failing to give warning suit-
able to the danger it was about to create, the question of negligence is for the
jury.
2.  RAILROADS—INJURIES TO PERSONS ON TRACK—CARE REQUIRED.
    The law requires a railroad company to give warning of the approach
and movements of its engines, and, under the varied conditions of their opera-
tion, requires generally that such warning shall be timely and sufficient, and
what is a warning sufficient to enable persons on or near the tracks to avoid
danger, depends upon the place of danger, the position of the person endan-
gered, and the right and purpose of his presence.
3.  RAILROADS—INJURIES TO PERSONS WORKING ABOUT CARS—QUESTION
    FOR JURY—NEGLIGENCE.
    In an action against a railroad company, for injuries resulting in the
death of a person working on or about its tracks in the yard of an independent
employer, in which its switch engines were operated, whether defendant
failed to give a sufficient warning held, on the evidence, for the jury.
4.  RAILROADS—ACTION FOR INJURIES TO PERSON ON TRACK—ADMISSI-
    BILITY OF EVIDENCE.
    In an action for wrongful death against a railroad engaged in switching
cars on tracks in the yard of a Pullman car company, by whom the decedent
was employed, where defendant was charged with failing to give proper
warning of the danger from the switching of cars, evidence as to the custom
of Pullman employees to pass between the cars when no switching was being
done, that there was no rule against such passing, and that it was the custom
of the defendant itself to so place cars that spaces were left between them
through which employees might pass about their work, is admissible.
5.  RAILROADS—INJURY TO PERSON WORKING NEAR TRACK—EVIDENCE.
    In an action against a railroad company for negligently causing the
death of an employee of a Pullman car company, in whose yard it operated
a switch engine, evidence that the foreman of the Pullman Company was
about to pass between cars as the decedent did, without any testimony that
placed him in an exact position with decedent, is irrelevant, since it had no
tendency to prove either conditions or customs, nor the absence of negligence
on decedent's part.

25 Del.]        GATTA vs. P., B. & W. R. R. Co.        357

Syllabus.

6. RAILROADS—INJURIES TO PERSONS WORKING ON TRACK—CUSTOMARY
USE OF TRACK—EFFECT OF SIGNS AND NOTICES.

Where a Pullman car company, in whose yard cars were switched by
defendant railroad company to be repaired and renovated, had put up signs
which read: "Notice. Employees must not work under cars, or on scaffolds
or ladders inside of cars, or pass betwen cars, while cars are being shifted in the
yard"—the notice meant and was understood by employees to mean that
work on cars should stop, and workmen should not pass between them after
an actual warning, or after they otherwise knew that there was or was about
to be shifting, and, until they received warning, or otherwise knew, that
shifting was to be done upon the track on which they were working, they were
to keep on with their work.

7. RAILROADS—INJURIES TO PERSONS WORKING ON TRACK—CONTRIBU-
TORY NEGLIGENCE.

There is no negligence without fault, and, to hold an employee of a Pull-
man car company negligent in passing between cars standing on tracks in
the company's yard, it must be shown that the employee charged with knowl-
edge of the danger, was in fault in passing between the cars after he was
warned, or otherwise knew, or by the exercise of care, measured by the char-
acter and custom of the place and of his occupation, might have known, that
shifting was to be done.

8. RAILROADS—CARE REQUIRED OF PERSONS ON OR NEAR TRACK.

A person employed in the yard of a Pullman car company, which was a
place of safety until changed into a place of danger by the shifting of cars at
irregular intervals by an independent railroad, is required, while crossing the
tracks and passing between the cars of his employer, to exercise care different
from that ordinarily required of one in crossing the tracks of a railroad, and
may assume that the railroad, when shifting cars in the yard, would give the
customary warning, and unless he saw, or otherwise knew, of the shifting, he
may pursue his employment until given warning of the danger sufficient to
enable him to avoid it.

9. RAILROADS—ACTION FOR INJURIES TO PERSONS ON TRACK—QUESTION
FOR JURY—CONTRIBUTORY NEGLIGENCE.

In an action against a railroad company for injuries resulting in the
death of a person working on and about its tracks, in the yard of an independ-
ent employer, in which its switch engines were operated, plaintiff's contribu-
tory negligence *held*, on the evidence, for the jury.

(*June* 20, 1911.)

CURTIS, Ch., PENNEWILL, C. J., and Associate Judges CONRAD
and WOOLLEY sitting.

*Horace G. Eastburn* and *Anthony Higgins* for plaintiff in
error.

*Ward, Gray* and *Neary* for defendant in error.

Supreme Court, June Term, 1911.

WRIT OF ERROR (No. 4, June Term, 1912) to the Superior
Court for New Castle County. Action by Frances Theresa
Gatta against Philadelphia, Baltimore and Washington
Railroad Company (No. 57, September Term, 1907) to recover

damages for death of plaintiff's husband. Judgment for defendant (1 *Boyce* 293, 76 *Atl.* 56), and plaintiff brings error. Reversed. The facts and questions presented appear in the opinion of the court. (See trial of same case, *post* 551.)

WOOLLEY, J., delivering the opinion of the court:

This is a writ of error to the Superior Court for New Castle County, brought to review the proceedings and judgment in an action instituted by the plaintiff to recover damages for the death of her husband, occasioned by the alleged negligence of the defendant, wherein the jury under the instruction of the court rendered a verdict for the defendant.

From the evidence disclosed by the record, it appears that Charles Gatta, the plaintiff's husband, was, on the day of the injury that caused his death, and for a considerable period theretofore, had been in the employ of the Pullman Company at its car works in the City of Wilmington; that the premises of the Pullman Company were located on the easterly side and adjoining the elevated tracks of the main line of the defendant railroad company, its buildings and shops were situated some distance southerly thereform, and between the elevated tracks of the railroad company and the shops of the Pullman Company, there was an inclosed yard; that within this yard placed parallel with the shops of the Pullman Company and the elevated structure of the railroad company were three railroad tracks, which were designated and known as tracks "A," "B" and "C," A being the one nearest the shops, C the one nearest to the elevated road and furthest from the shops, and B the one between the other two; that these tracks were connected at or about the entrance to the yard with tracks and sidings belonging to the railroad company which further on were connected with its main line of railway; that tracks A, B and C, as well as the yard within which they were located, were the private property of the Pullman Company, upon which Pullman cars stood while being repaired, and over which the railroad company shifted Pullman cars in delivering or receiving them in its business of transportation.

It appears that between the shops and track A there was a

wooden platform or flooring and a like platform or wooden pas-
sageway between tracks A and B, and that the distance between
the shops and track A was about eight or nine feet. It is
further shown that on the morning of the accident, five Pull-
man coaches were standing on track A, being uncoupled and at
short distances apart from each other, that two or more were
on track B and that one or more were on track C; that upon
that day, Gatta was working in what was known as the wash
stand and hopper gang, and a few minutes prior to his death had
been making repairs to a hopper in a car on track B; that he left
this car for the purpose of seeing his foreman, Cooney, who was
in a shop a short distance east of track A; that in going from
the car on track B to see his foreman, it was necessary for Gatta
to cross track A; that some time on the morning of the accident a
shifter had worked on track C, after which it left track C and went
out of the yard; that while Gatta was in the shop the shifter
returned to the yard upon track A, pushing a Pullman car ahead of
it and stopped just within the gate; that while Gatta was still in
the shop, the crew of the shifter, which was owned and operated
by the defendant railroad company, caused notice to be given
that shifting was about to be done on track A, by having one of
its crew and one of the Pullman employees to pass along each
side of track A calling, "Look out on track A"; that this warning
was given from two to three or from three to four minutes before
Gatta and Cooney came out of the shops on their way back to
track B.

It is further given in evidence that the shifting crew con-
sisted of Baylis, Cox, Donovan and Nugent, who were lined up
in this order along the cars between tracks A and B, Baylis being
near the engine, Cox, the conductor, standing at or about the
second car from the engine and Nugent several cars away at the
point of the accident, with Donovan between Nugent and Cox,
and that Jones, the engineer, from his position in the right side of
his cab next to track B, either by looking forward or from the
side, could see only Baylis and Cox; that within the period of from
two to four minutes after the warning had been given, Gatta came

out of the shop, on his way back to track B, followed by Cooney, and walked rapidly for about twelve or fifteen feet diagonally across the narrow space between the shop and track A, in the direction of the shifter and towards an opening between two cars on track A; that Nugent and employees of the Pullman Company were at this opening on the side of track A next to track B, but in the passageway between track A and the shop there was no one to notify Gatta and Cooney that shifting was about to be done on that track or to warn them of the danger towards which they were rapidly walking, and that after the preliminary and customary warning given while Gatta was in the shop from two to four minutes before he came out, no other warning was heard save perhaps by the engineer, until Gatta got between the cars.

It further appears that from the time Gatta left the building until he started between the cars, the cars were still, and while passing between them, Gatta stopped to let some one pass from the platform of one of the cars to the platform of the other, and as he afterward proceeded, the shifter caused the cars to come together and he was crushed.

It was shown that upon several of the buildings of the Pullman Company the following notice was posted: "Notice. Employees must not work under cars or on scaffolds or ladders inside of cars or pass between cars while cars are being shifted in the yard.   John Cannon, Manager."   As to the observance of this rule, Polster, a witness, testified in substance, that he knew of the existence of the rule, that he never paid much attention to it. The rule was to run (meaning to work with dispatch) and that his boss always told him when the shifter came in, to stay away from the cars they "hollered on, and until they hollered" he kept on working.

The witness Cooney testified in part:

"X. What is the warning that is given there when they shift cars on A track?

"A. It is 'Look out on A track,' or 'Look out on B track,' or 'Look out on C track'—whatever track it is—'Look out; a shifter is in the yard.'

"X. Who does that?

Opinion.

"A. The Pennsylvania shifting crew, and the Pullman crew on that day.

"X. They just call, when shifting is about to be done on A track, to 'Look out on A track,' or 'Look out for the shifter on A track?'

"A. They just come along and holler when the shifter comes in the yard. The shifter gets in the gate and then it generally stands there while the warning is given through the yard, and they most always holler each side of the car.

"X. Every time shifting is to be done on A track, they come down each side, calling 'Look out on A track?'

"A. Yes, sir.

"X. That is the regular signal or warning given in shifting there?

"A. Yes, sir."

The engineer of the shifter testified that it was customary when he ran his engine on to track "A", for the purpose of shifting on that track, to stop the engine before shifting began.

"Q. What was done after you stopped on this track (meaning 'A') by yourself or the crew of your shifter?

"A. I stopped there and waited until I got a signal from the crew to come head. They generally went up and down the track and hollered 'Look out on A.'

"Q. Did they do it on this occasion?

"A. Yes, sir.

"Q. You say they generally did it?

"A. Yes, sir.

"Q. Do you mean to say they generally did it before they did shifting on that track?

"A. On A track.

"Q. Who gave the warning in your crew?

"A. That morning I heard Conductor Cox and the gang boss of the Pullman Company—heard them particularly."

From this statement of the facts it appears that in some of its aspects this case resembles the case of *Rex v. Pullman's Palace Car Company*, 2 *Marv.* 337, 43 *Atl.* 246, although none of the

questions there raised and decided were presented or considered in the trial of this case.

On the defendant's motion, the court below directed a nonsuit, which the plaintiff refused to accept, whereupon the court gave to the jury binding instructions to return a verdict for the defendant, upon the grounds that the plaintiff had produced no evidence from which negligence on the part of the defendant could reasonably be inferred and that from the evidence produced by the plaintiff it appeared that the plaintiff's husband was guilty of contributory negligence.

The errors assigned to have been made by the trial court and which are here under review, are seven in number, and when considered generally, relate, first, to the court's refusal to permit the plaintiff to prove that in the absence of shifting, it was customary for the Pullman employees to pass between the cars standing upon the tracks; second, to the rejection of evidence that there was no rule against employees of the Pullman Company passing between the cars in the progress of their work, when shifting was not being done; third, to the rejection of evidence that Gatta's foreman, was on the point of passing between the cars at the time of the accident; fourth, to the court's refusal to permit the plaintiff to show the custom of the engineer in charge of the shifter, when shifting on track A, to place the cars at short distances apart; and fifth, to the court's direction to the jury to return a verdict for the defendant.

By a further classification, the questions of law presented for consideration may be reduced to three in number, which are,

*First.*   Was the defendant negligent?

*Second.*   Did the Court err in rejecting testimony offered to show the character of the place in which the plaintiff's husband worked and the customs and conditions that prevailed in and about the place of his employment?

*Third.*   Was the plaintiff's husband guilty of contributory negligence?

[1] *First.* The court below found, as a matter of law, that Gatta came to his death without negligence on the part of the defendant.   In order to determine whether the court below erred

in so finding, it becomes necessary to inquire, whether, if the case had been submitted to the jury, the jury may not have found, from the matters of fact, that the defendant was negligent in failing to give a warning proportioned to the danger it was about to create.

[2] The law imposes upon a railroad company the duty to give warning of the approach and movement of its engines and trains, and under the varied conditions of their operation, requires generally that such warning shall be timely and sufficient. What constitutes a warning that in time and manner is sufficient to enable others to avoid danger, depends upon the character of the place at the point of danger, the position of the persons endangered and the right, lawfulness and purpose of their presence. It therefore becomes necessary to consider the character of the place in which Gatta worked and was killed, the nature of the warning given and the extent to which Gatta was protected by it.

[3] The yard, which inclosed the tracks designated as A, B and C, was the property of the Pullman Company and formed a part of the plant and premises in and about which it conducted its business of renovating and repairing Pullman cars. The three tracks within the yard were likewise the property of the Pullman Company. They were not constructed nor used for the purpose of traffic except as the railroad company delivered and received cars to and from them in its business of transportation, and they were arranged and used by the Pullman Company as tracks upon which to place and rest cars while undergoing repair and renovation. When placed upon the tracks, the cars were not joined or coupled but were placed apart, in order that workmen might work upon the ends of the cars in the spaces left between them. When placed in such positions, the cars were repaired within and without by gangs of workmen of various trades, whose places of work were changed and controlled by the location of the particular cars to which they were assigned. Thus the yard was in no sense a highway nor the railroad tracks a railroad in the ordinary meaning, but the yard and tracks together constituted a large open-air workshop in no way distinguished in point of danger from an inclosed shop in which work of a like character is conducted.

When no shifting was being done, it was a place of safety. When shifting was being done, it became a place of great and unusual danger.

It was the duty of the defendant railroad company, when about to move the cars that occasioned the injury to Gatta, to give a warning that was timely and suitable to the danger. It appears that a warning was given from two to four minutes before the cars were moved, by sending men along each side of the track calling "Look out on track A," and that such a warning may have been timely and sufficient to all those within its sound. But it appears that at the time the warning was given, Gatta was inside of a shop and it is not shown that he was in a position to hear it. When he came out of the shop and walked into the position of peril, there being no one between the shop and the opening to repeat to him the warning that had been given to others, he had received no warning that shifting was about to be done on the track that he was about to cross.

The duty imposed upon the defendant to give a warning that there was about to be danger on track A, contemplated a warning not only to those who were present when the warning was given, but to those who might be present when the danger came. It contemplated a warning to all who were put in peril. It was not limited to those who were at work within, upon and under the cars upon the track, but extended to those who otherwise might lawfully come within the zone of danger, in ignorance of their peril. If the warning given the former did not reach the latter, then as to the latter, a jury may have found the warning to have been stale and insufficient, and likewise may have found negligence on the part of the defendant.

[4] *Second.* When the act of negligence charged against a defendant railroad company is its failure to give timely and suitable warning of the danger to be avoided, the warning in point of time and sufficiency, has relation to and is controlled by the peculiar conditions of the place, the established and recognized habits and customs of its occupants and the particular dangers to be encountered. In order for the jurors to have determined whether the warning given by the defendant company in this case, was

timely and sufficient, the peculiar dangers of the places should have been shown them by admitting testimony of the custom of Pullman employees to pass between cars when no shifting was being done, that there was no rule against them passing between cars when there was no shifting and that it was the custom of the defendant company itself to so place cars that spaces were left through which employees might pass when about their work. Upon proof of such conditions of place and occupation, a jury might find to be insufficient a warning which under other conditions it would find to be timely and sufficient.

[5] The trial court, however, properly rejected testimony offered to show that the foreman was about to do what Gatta did, as the act of the foreman, in the absence of testimony that placed him in an exact position with Gatta, tended to prove neither conditions nor customs, nor the absence of negligence on Gatta's part.

*Third.* The court below found, as a matter of law, that Gatta, at the time of his injury, was guilty of contributory negligence. It was held that when Gatta passed between the cars with a knowledge of the rule posted on the buildings and of the dangerous character of the yard, and after the particular warning that had been given, which "was a sufficient warning for everybody else," his act was one of negligence.

The contention of the defendant that the deceased was guilty of contributory negligence appears to be based upon five grounds:

(a) That Gatta passed between the cars after the defendant had given a timely and sufficient warning of its intention to shift them.

(b) That he passed between the cars when cars were being shifted in the yard, contrary to the posted rule, of which, it must be assumed, he knew.

(c) That he attempted to cross the track by passing between the cars, which was a dangerous and unnecessary thing to do.

(d) That he stopped between the cars.

(e) That he saw or ought to have seen the shifter, if he had looked before passing between the cars.

(a) The contributory negligence charged to Gatta in passing

between the cars after the defendant had given a timely and sufficient warning, is to be determined by the character of the warning in point of time and sufficiency, and the conduct of Gatta after he knew or should have known of it. This first question has received our consideration, the remaining question relates only to Gatta's conduct after the warning. It appears from the evidence that at the time the warning was given, Gatta was in a shop conferring with his foreman, and it does not appear from the evidence whether he did hear or could have heard the warning. It further appears that within two to four minutes after the warning was given, he came out of the shop and walked twelve to fifteen feet directly toward the opening between the cars, and although there is a conflict of evidence as to whether the bell of the shifter at the extreme of the track was then ringing, there is evidence that there was no one present between track A and the shop to repeat to Gatta the warning that had been given to others.

[6] (b) The negligence imputed to Gatta for violating a rule made for his protection, depends upon the interpretation of the rule. Upon the buildings of the Pullman Company appeared a number of signs which read as follows:

"Notice. Employees must not work under cars or on scaffolds or ladders inside of cars or pass between cars while cars are being shifted in the yard."

The general inhibition of the terms of this rule under a certain condition, implies a general permission under another condition. Considered with reference to the character of business in which the Pullman Company was engaged, and the character of work in which its servants were employed, it is patent that "work under cars or on scaffolds or ladders inside of cars" was at some time necessary to be done. If this kind of work was prohibited "while cars are being shifted," it must have been permitted while cars were not being shifted, and if employees were prohibited to "pass between cars while cars are being shifted," then by a parity of reasoning as well as from the nature of their work, employees must have been permitted to pass between cars while cars were not being shifted. The manifest purpose of the rule is the protection of employees from the dangers of shifting while working

about cars, and the rule manifestly comprehends work that calls upon or permits the workmen to pass between the cars as well as work that has to be done under and within them.   It is therefore a fair conc'usion that the posted notice meant and the employees so understood, that work on cars should stop and workmen should not pass between them after an actual warning, such as "Look out on track A," or after they otherwise knew that shifting was being done or was about to be done, and that until they received warning or otherwise knew that shifting was to be done upon the track upon which they were working, they were to keep on with their work.

[7] Whether Gatta by his own negligence contributed to his injury depends upon his act of passing berween the cars, charged with knowledge of the danger.   There is no negligence without fault, and to hold Gatta negligent it must have been shown that Gatta was in fault in passing between the cars after he was warned, or otherwise knew or by the exercise of a care, measured by the character and custom of the place and of his occupation, he might have known that shifting was to be done.   In point of fact there is nothing in the testimony to show that Gatta heard or could have heard the warning given from two to four minutes before he came out of the shop.   There is testimony by the engineer of the shifter that from the time of the first warning the bell was rung continuously till the time of the injury, but other witnesses testified that the bell was rung only when the warning was first given, which was while Gatta was in the shop and from two to four minutes before he came out.   It is not shown that Gatta knew  or by the exercise of a proper care could have known, that cars were being shifted or had been shifted at any place within the yard at any time that day.   There is testimony that during the morning of that day shifting had been done on track C.   If this be so, it is not shown that Gatta knew it when he went into the shop fifteen minutes before he was killed, or if he then knew it, there is nothing to show that Gatta knew that the shifter had left track C, or after it had left track C, and had gone out of the yard, that Gatta knew it had returned to do shifting on track A.

(c) The attempt made by Gatta to cross the track by passing

between the cars may, not have been, under all circumstances, a dangerous and unnecessary thing to do. In the absence of shifting it was a perfectly safe thing to do, and in the progress of his work it may have been a necessary thing for him to do.

(d) After entering the passageway between the cars, Gatta stopped to let a man pass above him from the platform of one car to the platform of the other. If he had not stopped, he might have escaped injury. But it cannot be said, as a matter of law, that it was negligence for Gatta to stop between the cars when his passage was interrupted by the act of another. It might have been an unexpected hindrance or an unavoidable difficulty that confronted him after he got between the cars that made retreat as dangerous as advancing. There is no evidence of the length of time he stopped, that he delayed his progress after he could have gone forward, or that the injury could have been avoided by receding.

(e) The final ground upon which the defendant charges Gatta with contributory negligence is that he saw or by looking could have seen the shifter on track A before passing between the cars, and thereby knew or should have known that shifting was to be done on that track.

The evidence shows that Gatta, followed by Cooney, came out of a shop and walked for a distance of twelve to fifteen feet diagonally to the opening between the cars, that they walked in the general direction of Twelfth Street, which could be seen by them, and that the shifter was in that direction at the end of several Pullman cars. The evidence, however, does not show that Gatta, after coming out of the shop did see, or by looking from any angle, could have seen the shifter. Indeed, the trial court, in holding Gatta guilty of contributory negligence, having before it plots which this court has not, expressly assumed that he could not have seen it. Furthermore, the engineer testified, that from his position on the right side of his cab, he could not see the point at which Nugent was standing at the right side of the opening through which Gatta attempted to pass. It is fair to assume that the thing that prevented the engineer in the shifter seeing a point opposite that of the accident on one side of the track, whether

it was the distance of the shifter from the opening or the course or direction of the track, would likewise have prevented Gatta seeing the shifter from a point opposite the same opening on the other side of the track.

[8] When the character of the place in which Gatta worked is considered in connection with the purpose and character of his employment, it is plain that in crossing the tracks and passing between the cars of his employer, there was required of him a care and caution different from that which is ordinarily required of one in crossing the tracks of a railroad. A railroad is a place of danger and in itself is a warning of its constant perils. The yard in which Gatta worked was a place of safety, free from the perils of a railroad, until changed into a place of danger by the shifting of cars at irregular intervals. Gatta had a right to assume that the agency that transformed his place of safety into one of danger would acquaint him with that change by giving the customary warning, and unless he saw or otherwise knew of the change and its consequent peril, he had a right to pursue his work in the orderly manner of his employment until there was given a warning of the danger sufficient to enable him to avoid it.

[9] Applying to the testimony in this case the principles of the law of negligence as stated and established by the decisions of this court, we are of opinion that there was evidence, which if submitted to the jury, would have sustained a finding of negligence on the part of the defendant and the exercise of a proper care on the part of the plaintiff's husband, and that the court below erred in holding as matters of law, that the injury complained of occurred without negligence on the part of the defendant and because of negligence on the part of the plaintiff's husband.

Finding error in the proceedings below as specified by the first, second, fifth, sixth and seventh assignments of error, the court directs that—

The judgment below be reversed.