———————o———————

Philadelphia, Baltimore and Washington Railroad Company, a corporation of the State of Delaware, defendant below, plaintiff in error, *vs.* Frances Theresa Gatta, plaintiff below, defendant in error.

1.  Appeal and Error—Motion for New Trial—Discretionary Ruling.

A motion for a new trial being addressed to the court's discretion, a writ of error will not lie to review the court's decision upon it, in the absence of an abuse of discretion.

2.  Appeal and Error—Exception—Necessity—Denial of New Trial.

In the absence of an exception to the denial of a new trial, such denial could not be reviewed to determine whether it was an abuse of discretion.

3.  Limitation of Actions—Operation of Statute—Amended Complaint.

Where an action for wrongful death was instituted against a railroad company within the one-year limitation period prescribed by 20 *Del. Laws*, *c.* 594, by filing a præcipe, and the declaration filed alleged that deceased was an employee of the defendant company, the cause of action stated by an amended declaration, filed after the expiration of the year, alleging that he was an employee of the Pullman Company, and charging the defendant company with the duties owed to a stranger, was not barred by such statute; an action at law being commenced in this state, so as to stop the running of limitations, by præcipe, and not by the plaintiff's declaration, as in many states.

4.  Pleading—Declaration—Counts.

A declaration may contain any number of counts, providing it does not violate the rule against vexatious pleading, and each count presents a separate and distinct cause of action, which is appropriate to the form of action pleaded.

5.  Pleading—Answer—Sufficiency.

The defendant must make separate answer to each count, where the declaration contains several proper counts.

6.  Pleading—Amendment.

Under *Const.* 1897, *art.* 4, § 24, and *Rev. Code* 1852, *c.* 112, § 11, authorizing the Superior Court to allow amendments, the court in its discretion may allow an amendment at any time before judgment, whether limitations would have run against the cause stated in the amendment, if made the subject of a separate action, or not.

7. Trial—New Trial—Conflicting Evidence.

Where, in an action for the death of a Pullman car employee engaged in repairing cars, from a car being shifted without warning to him by the defendant railroad company, plaintiff's evidence, taken alone, showed that the accident was due to the defendant's negligence while deceased was exercising proper care, the trial court properly refused to direct a verdict for defendant, or to set aside a verdict for plaintiff, though defendant's evidence on the determining issue whether the deceased was warned conflicted with plaintiff's evidence and was of a more positive character.

8. Trial—Instructions—Direction of Verdict.

The court should direct a verdict, when the evidence is not controverted, and the law as applied to that evidence produces but one legal result; but when a case involves an issue of fact, on which the evidence is conflicting and would support a verdict for either party, such issue should be left to the jury.

9. New Trial—Grounds—Sufficiency of Evidence.

Where the evidence warrants the submission of issues of fact to the jury, the trial court will not, on motion for new trial, disturb the verdict because against the evidence, though the preponderance is against the verdict.

10. Trial—Weight of Evidence—Positive and Negative Evidence—Province of Jury.

The rule that positive testimony outweighs negative testimony does not conflict with the rule that the weight of conflicting testimony shall be left to the jury, but is merely a rule of measurement for use by the jury.

11. Evidence—Negative Evidence.

Where, in an action against a railroad company for the wrongful death of a Pullman car employee engaged in repairing cars, due to the shifting of a car without warning to him, the witnesses who testified that no warning was given while deceased was where he could have heard it had special opportunities, by reason of their being engaged in the railroad yard in occupations similar in the matter of danger, to hear and remember such warning if it had been given, their testimony was not purely negative in character.

(*January* 22, 1913.)

Curtis, Ch., Pennewill, C. J., and Woolley, J., sitting.

*Ward, Gray and Neary* for plaintiff in error.

*Horace G. Eastburn* (*Anthony Higgins* with him on the brief) for defendant in error.

Supreme Court, January Term, 1913.

Writ of Error (No. 4, June Term, 1912) to the Superior Court in and for New Castle County (No. 119, May Term, 1907, below). (See also 1 *Boyce*, 293; 2 *Boyce* 356, 551.) Action by Frances T. Gatta against the Philadelphia, Baltimore and Washington Railroad Company for damages for death of her husband, alleged to have been occasioned through the negligence of the defendant company. Verdict for plaintiff. Defendant brings error. Affirmed.

The court stated the case as follows:

On the trial before the Superior Court for New Castle County, in which a verdict was rendered for the plaintiff, it appears from the testimony, as disclosed by the record, that Charles Gatta, the plaintiff's husband, was, on the day of the injury that caused his death, and for a considerable period theretofore, had been in the employ of the Pullman Company at its car works in the City of Wilmington; that the premises of the Pullman Company were located on the easterly side of and adjoining the elevated tracks of the main line of the defendant railroad company, its buildings and shops were situated some distance southerly therefrom, and between the elevated tracks of the railroad company and the shops of the Pullman Company, there was an inclosed yard; that within this yard placed parallel with the shops of the Pullman Company and the elevated structure of the railroad company were three railroad tracks, which were designated and known as tracks "A", "B" and "C", A being the one nearest the shops, C the one nearest the elevated road and furthest from the shops, and B the one between the other two; that these tracks were connected at or about the entrance to the yard with tracks and sidings belonging to the railroad company which further on were connected with its main line of railway; that tracks A, B and C, as well as the yard within which they were located, were the private property of the Pullman Company, upon which Pullman cars stood while being repaired, and over which the railroad company shifted Pullman cars in delivering or receiving them in its business of transportation.

It appears that between the shops and track A there was a wooden platform or flooring and a like platform or wooden passageway between tracks A and B, and that the distance between the shops and track A was about eight or nine feet, and that a heavy wooden fence, six or seven feet high, divided the end of the yard from Twelfth Street, somewhat obstructing the view beyond the yard. It is further shown that on the morning of the accident, five Pullman coaches were standing on track A, at least three of which were uncoupled and stood at short distances apart from each other, that two or more were on track B and that at least one was on track C; that upon that day, Gatta was working

in what was known as the washstand and hopper gang, and a few minutes prior to his death had been making repairs to a hopper in a car on track B; that approximately five minutes before the injury, he left this car for the purpose of seeing his foreman, Cooney, who was in a shop a short distance east of track A; that in going from the car on track B to see his foreman, it was necessary for Gatta to cross track A; that some time on the morning of the accident a shifter had worked on track C, after which it left track C and went out of the yard; that while Gatta was in the shop the shifter approached the yard upon or toward track A, preparatory to doing shifting on that track and stopped either outside of the yard or partly without and partly within the yard; that while Gatta was still in the shop, the crew of the shifter, which was owned and operated by the defendant railroad company, caused notice to be given that shifting was about to be done on track A, by ringing the bell and by having one of its crew and one of the Pullman employees pass along each side of track A calling, "Look out on track A"; that this warning was given from two to four minutes before Gatta and Cooney came out of the shop on their way back to track B, but whether it was given before or after Gatta went into the shop is a matter of dispute. By some witnesses it was testified that the warning was repeated down to the time of the injury in such a manner that Gatta could and should have heard it. By others it was testified that no warning was heard after that given at a time when Gatta was in the shops and out of hearing.

It further appears that from the time Gatta left the building until he started between the cars, the cars were still, and while passing between them, Gatta stopped to let some one pass above him from the platform of one of the cars to the platform of the other, and as he afterward proceeded, the shifter caused the cars to come together and he was crushed.

It was shown that upon several of the buildings of the Pullman Company the following notice was posted: "Notice. Employees must not work under cars or on scaffolds or ladders inside of cars or pass between cars while cars are being shifted in the yard. John Cannon, Manager." As to the observance of this rule,

witnesses testified in substance that they knew of the existence of the rule, but never paid much attention to it, for while it was a general rule applying to all within the yard, it was likewise generally understood to apply only to those working on or about the track with respect to which warning had been given and that men working on cars on other tracks were expected to keep right on working, in a knowledge that the danger was not on their tracks.

WOOLLEY, J., after stating the case, delivered the opinion of the court:

The errors charged to have been committed in the trial of this case by the court below are twenty-eight in number, of which errors assigned in specifications No. 21 to No. 28, inclusive, relate to the court's refusal to grant a motion for a new trial.

[1] In the practice and policy of the law of this state relative to new trials, a motion for a new trial is a matter addressed to the legal discretion of the court (*Fitzgibbon's Adm. v. Kinney,* 3 *Harr.* 72, 73; *State v. Layton,* 3 *Harr.* 469, 480), and to the decision of the court upon such a motion, as to the decisions of the court generally upon rules to show cause, a writ of error will not lie. *Burton v. P., W. & B. R. R. Co.,* 4 *Harr.* 252, 254; *Mitchell v. Woodward,* 2 *Marv.* 311, 313, *Valley Paper Co. v. Smalley,* 2 *Marv.* 289, 294, 295, 43 *Atl.* 176; *Riding v. McMenamin,* 1 *Penn.* 15; *Whitaker v. Parker,* 2 *Harr.* 413, 416.

[2] To the refusal of the court to grant a new trial, the record discloses no exception noted by the defendant below or allowed by the court below, nor does the defendant below, now the plaintiff in error, charge to the court below any abuse of its discretion or misconduct in rendering its decision against the motion, that might take the case out of the general rule against reviewing as error the decision of a trial court in a matter addressed purely to its legal discretion. Therefore, nothing that is assigned as error in the last eight assignments of error, that is not also embraced in some preceding assignment of error, will be considered in this decision.

[3] Charles Gatta was killed on the twenty-eighth day of June, 1907. This action was instituted by his widow on the

ninth day of August, 1907, the original declaration was filed on the eighth day of August, 1908, and the amended declaration on the twenty-first day of January, 1910.

In the original declaration, the plaintiff averred that the deceased was an employee of the defendant company, charged the defendant company with the duties of a master, alleged breaches thereof and sought to recover upon its liability therefor. In the amended declaration, the plaintiff averred that the deceased was an employee of the Pullman Company, charged the defendant company with the duties it owed a stranger, alleged breaches thereof and sought to recover upon its liability for a violation of its duties in that relation.

It thus appears that while each declaration states a cause of action growing out of the same circumstances from which the deceased met his death, the material averments of the two declarations differ, and it also appears that the difference in point of law, consists in the difference in the relations alleged by the two declarations to have existed between the deceased and the defendant, the corresponding difference in duty which the defendant is charged to have owed the deceased and the consequent difference of the defendant's liability for breaches of that duty.

The amended declaration being the one exclusively relied upon at the trial, the defendant moved that the jury be instructed to render a verdict in its favor, upon the ground that the amended declaration presented a cause of action wholly new and wholly different from the one presented by the original declaration, that the amended declaration thus presenting a new cause of action was filed after the expiration of one year from the date upon which the injuries to the deceased were sustained, or at a time when an original action upon the cause of action therein stated would have been barred by the statute of limitations, and therefore recovery upon the cause of action stated by the amended declaration was likewise barred.

The act limiting actions for personal injuries relied upon in support of this motion, provides, that "no action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of one year from the date upon which

it is claimed that such alleged injuries were sustained." *Chapter 594, Volume* 20, *Laws of Delaware.*

The refusal of the trial court to grant this motion is assigned as error and is here submitted for review.

The contention made by the defendant is a novel one in this jurisdiction, and is based upon decisions of the courts of certain other jurisdictions, which plainly hold that when a cause of action set forth in an amended pleading in a pending litigation is new, different or distinct from that originally declared upon, the amended pleading is equivalent to the bringing of a new action, and the statute of limitations is not arrested by the institution of the suit but runs against the new cause of action down to the time it is disclosed by the amended pleading. *Central Georgia Ry. Co. v. Williams,* 105 *Ga.* 70, 31 *S. E.* 134; *Mahoney v. Park Steel Co.,* 217 *Pa.* 20, 66 *Atl.* 91; *Box v. Chicago Ry. Co.,* 107 *Iowa,* 660, 78 *N. W.* 694; *Union Pac. Ry. Co. v. Wyler,* 158 *U. S.* 285, 15 *Sup. Ct.* 877, 39 *L. Ed.* 983; *Wabash R. Co. v. Bhymer,* 214 *Ill.* 579, 73 *N. E.* 879; *Chicago City Ry. Co. v. Leach,* 182 *Ill.* 359, 55 *N. E.* 334; *Fish v. Farwell,* 160 *Ill.* 236, 43 *N. E.* 367; *Nelson v. First Nat. Bank,* 139 *Ala.* 578, 36 *South.* 707, 101 *Am. St. Rep.* 52; *Fleming v. City of Anderson,* 39 *Ind. App.* 343, 76 *N. E.* 267; *Illinois Ry. Co. v. Campbell,* 170 *Ill.* 163, 49 *N. E.* 315; *Dobbs v. Pearl (Sup.)* 118 *N. Y. Supp.* 485; *Wasson v. Boland,* 136 *Mo. App.* 622, 118 *S. W.* 663; *In re Spuyten Duyvil Road (Sup.)* 116 *N. Y. Supp.* 857; *Freeman v. Central Ry. of Ga.,* 154 *Ala.* 619, 45 *South.* 898; *Union Pacific R. Co. v. Sweet,* 78 *Kan.* 243, 96 *Pac.* 657; *Lane v. Water Co.,* 220 *Pa.* 599, 69 *Atl.* 1126; *Lane v. Foundry Co.,* 220 *Pa.* 603, 69 *Atl.* 1127; *Hess v. Bar. Ry., L. & P. Co.,* 149 *Ala.* 499, 42 *South.* 595.

The merit of these decisions and their value as authority for a like ruling in this jurisdiction, depend largely upon the statutes or policies of law of the jurisdictions in which they were rendered and the bearing which such statutes or policies has upon those that maintain in this jurisdiction.

The methods by which actions at law are instituted in those American jurisdictions that derive their jurisprudence from the common law, have as their original the method of commencing

actions at common law. The common-law mode of commencing an action at law was originally by petition to the king, and later, to him, through his Court of Chancery, praying for leave to bring an action in one of his courts of law upon a cause of action specifically stated in the petition. When the prayer of the petition was allowed, there issued an original writ, which in form was a mandate issuing out of the Court of Chancery, in the king's name, directed to the sheriff of the county wherein the injury was committed or the wrong was done, containing a statement of the cause of complaint, and requiring him to demand the defendant either to satisfy the claim and do justice to the complainant, or else appear in one of the superior courts of law and answer the accusations made against him.

The principal object of the original writ was to confer jurisdiction upon a court of law to hear the matter in controversy, for at common law no action could be maintained in any superior court without the sanction of the king's original writ. Its other object was to compel the appearance of the defendant. As this writ issued out of one court for the purpose of conferring jurisdiction upon another, obviously the writ could not be amended in the latter court. As the jurisdiction conferred by the writ upon the law court was limited to the trial of the specific cause of action stated in it, any subsequent statement of a cause of action different from the one stated in the writ was in excess of the jurisdiction conferred by the writ, and constituted a departure, and of course would not be allowed by amendment. Amendments of pleadings subsequent to the declaration at common law were liberally allowed both in point of character and time (2 *Burr.* 756), but an amendment to a declaration was restricted to one that did not depart from the action stated in the writ and then only when asked for before the end of the second term, for after that term the amendment was considered "a new declaration" and would not be allowed, 1 *Wilf.* 149, 223; *Say. R.* 234.

In using the English method of commencing actions at law somewhat as a model, American jurisdictions rejected such of its features as were inconsistent with American institutions and accepted such of them as were considered adaptable to the partic-

ular schemes or policies of the law of the several jurisdictions of which they were made a part. Some jurisdictions were impressed with the feature of the original writ which gave the defendant notice not only of the form of action but of the particular cause of action to which he was summoned to respond and in such jurisdictions actions at law are almost invariably begun by petitions, complaints or notices upon which or after which process issues. In such jurisdictions the cause of action as well as the form of action is disclosed by the petition or complaint, and the process, whatever its form, commands the defendant to appear and respond to that particular cause of action. Such is the law in almost every jurisdiction from which authorities are cited by the defendant in support of its contention. These jurisdictions are Alabama, California, Georgia, Indiana, Iowa, Kansas, Kentucky, Missouri, Nebraska, New York and Pennsylvania.

There is an intimate relation between the law that provides methods of commencing actions and the law governing the amendment of actions, for upon the theory upon which actions are commenced depends largely the logic or policy of the theory upon which amendments are allowed. Thus in the states of Georgia, Iowa, Kansas, Kentucky, Missouri, Nebraska and New York, where the cause of action appears in the complaints, petitions or process, the policy of the law is to restrict amendments to the very cause of action so stated, by providing by express statute for the allowance of such amendments only as "do not change substantially the claim or defense" or when they do not "add a new and distinct cause of action." Obviously, then in these jurisdictions, any amendment that sets up a cause of action substantially different from the one to which the defendant was expressly summoned to respond, would present a new or a different cause of action from that first sued upon, and would either be refused, or if allowed, would hazard the operation of the statute of limitations.

The case of *Sicard v. Davis*, 6 *Pet.* (*U. S.*) 124, 8 *L. Ed.* 342, is seldom omitted in the citation of authorities in support of the contention that a new cause of action presented by amendment after the limitation of a statute is barred by the statute. This was an action in ejectment in which the plaintiff alleged a different

demise and a new title by an amendment to the declaration, allowed at a time after the defendant had acquired a possessory title to the premises by operations of the statute of limitations. In that case, Chief Justice Marshall stated that "limitations might be pleaded to the second allegation (that is, to the amendment to the declaration), though not to the first, because the second count in the declaration, *being a demise from a different party asserting a different title*, was not distinguishable, so far as respects the bar of the act of limitations from a new action," and the court held that the case stated by the amendment was barred by the act of limitations intervening between the commencement of the action and the allowance of the amendment. This decision, however, when considered in connection with the particular form of action in which it was rendered, has little authoritative bearing upon the case under consideration, for an amended declaration in ejectment, setting up a different demise from a different party and therefore asserting a different title, might readily be held bad in Delaware, not simply because the cause of action stated by it would be new but because in our method of procedure in that form of action, the amendment would not be connected with or related to the parties to the suit without a corresponding amendment of parties, which is against the policy of our laws.

In Delaware an action of ejectment is commenced not by original or other writ, and in this respect it is an exception to the general rule, but by filing a declaration showing at large the premises of which the plaintiff alleges he was possessed by demise and from which he alleges to have been ejected. To this extent the commencement of the action resembles the mode generally pursued in some other jurisdictions. Service is made by delivering a copy of the declaration to the defendant and to the case as stated in the declaration the defendant is summoned to respond. The common-law fiction of the action maintains in Delaware and therefore the common-law rule maintains that the lessor of the plaintiff must have had the right of possession at the time of the demise mentioned in the declaration, which means of necessity, at or before the commencement of the action. Obviously, then an amendment to the declaration that sets up a new demise

from a different party asserting a different title from that declared upon in the original declaration, states much more than a new cause of action in that it states a cause of action between new persons who are not parties to that suit, the nominal plaintiff in an action of ejectment being a fictitious person and the real plaintiff in the action being a fictitious lessor, and of course cannot be maintained without an amendment of parties.

The case of *Union Pacific Ry. Co. v. Wyler*, 158 *U. S.* 285, 15 *Sup. Ct.* 877, 39 *L. Ed.* 983, was cited by the defendant as a controlling authority in support of its contention, because of the similarity of the defendant's liability under the pleadings in that case to the defendant's liability in the one under review, and the pronouncement of the law thereupon by the Supreme Court of the United States.

The plaintiff instituted in Missouri an action to recover for personal injuries sustained in Kansas, and after the removal of the case to a federal court, the question of law under consideration was taken to the Supreme Court of the United States for determination. In the original pleading, the plaintiff alleged that his injuries were occasioned by the negligent act of an incompetent fellow-servant of whose incompetence the defendant had knowledge, and charged the defendant with a violation of its duty as a master to supply him with competent servants with whom to work. After the removal of the case to the federal court, the plaintiff amended his petition, wholly omitting the charge of incompetence of his fellow-servant and the defendant's knowledge thereof, and based his cause of action simply upon the negligent act of the same fellow-servant, charging the defendant with liability therefor under a statute of Kansas, where the injury was inflicted, which gave a servant a right of action against a master for the negligence of a fellow-servant, without regard to the element of incompetence.

Between the time of filing the original and amended petitions the statute of limitations of Missouri intervened. There were really presented two questions, first, whether the case as stated in the amended petition constituted a new cause of action, and if so, was it barred by the statute of limitations.

27 Del.]  P., B. & W. R. R. Co. vs. Gatta.  49

Opinion.

This case is an authority in point upon the question whether the amended petition restated the original cause of action or presented one entirely new, as the amended pleading in that case deprived the defendant as a master of the defense of the servant's assumption of risk and charged it with a new liability under entirely different law, very much as was done by the amended declaration in the case under consideration. The court held that the amended petition stated a cause of action under the statute of Kansas that was in derogation of the general law of master and servant under which the plaintiff had declared in his original petition and therefore constituted a departure and set up a new cause of action. With this conclusion we take no exception. But the court further held that because it was a departure from the original petition and because it set up a new cause of action, the statute of limitations as applied to the new cause of action treated the action as commenced when the amendment was incorporated into the pleadings.

A careful reading of this case discloses that the Supreme Court reached this decision, if not by expressly construing the statutes of Missouri, then certainly by giving to them a consideration that is reflected in the decision, for the decision of the court in this case, like the decisions of the courts under like statutes in other jurisdictions, is in harmony with the policy of the law as declared in the jurisdiction in which the case arose.

In Missouri a civil action is begun by petition upon which a writ issues. *Civil Procedure*, c. 21, *Art.* 4, § 1756. To the cause of action presented by the petition, the defendant is summoned to respond, and it appears that to that cause of action alone is he required to answer. The petition presenting the cause of action, however, is susceptible of amendment, but amendment of the original petition is restricted by statute to such things as do "not change substantially the claim or defense" (*Civil Procedure, c. 21, Art.* 6, § 1848), which obviously means the claim as made by the original petition. The policy of the law of Missouri, therefore, and of a number of jurisdictions cited by the defendant where actions are begun by complaints or petitions, is to restrict the cause of action and the amendments thereof to the one stated in

the original petition, and if another cause of action be stated by amendment, to subject the new cause of action to the operation of the statute of limitations.

Like other American jurisdictions, the State of Delaware in providing a method for commencing actions at law adopted some of the features of the original writ at common law and discarded others. When comparison is made with the methods adopted by other American jurisdictions, and particularly with the methods in the jurisdictions mentioned, it will be observed that many of the features of the common law proceeding which were rejected by this jurisdiction are the very ones which other jurisdictions have considered important enough to accept, and upon further examination it will be disclosed that in this and in other jurisdictions the principle and effect of amendments in actions at law are consistent with and controlled by the particular policies of law which were adopted by the several jurisdictions in determining their different methods of instituting actions.

Except in certain summary proceedings, an action at law is commenced in this state, not by petition or complaint, but by *praecipe*, which for such a purpose, is a mandate to the prothonotary directing him to issue process or a writ of a particular character in the action thereby instituted, commanding the sheriff to summon the defendant to appear and answer the plaintiff in a particular form of action. The features of this proceeding that distinguish it from the proceeding at common law and from proceedings in some of the jurisdictions that have been adverted to, are that the action is thus begun upon the command of the plaintiff and not upon his petition, the process issues of course and not by leave, the form of action is stated in both the *praecipe* and the process while the cause of action is stated in neither, and the purposes of the writ are to disclose to the court its jurisdiction in an action of that form and to compel the appearance and answer of the defendant thereto.

As causes of action of many different characters may be embraced within one form of action, notably in the form of an action of trespass on the case, the defendant in an action at law instituted in Delaware is not informed of the nature of the plain-

tiff's complaint or of the character of his cause of action until in the course of the proceeding and pursuant to certain rules for pleading, the plaintiff files his declaration. Then and not until then does he know to what he is summoned to respond.

[4, 5] Under the practice of the courts of this state, a plaintiff has a right to insert in his declaration any number of counts, having regard of course to the rule against vexatious pleading, provided that each count presents a separate and distinct cause of action and that each cause of action so presented is appropriate to the form of action in which it is pleaded, and to each count, constituting as its name signifies, a separate "tale" or complaint, the defendant must make separate answer.

[6] In order to remove from the administration of justice the stigma that existed in early history of trying technical questions rather than merits and deciding causes apart from the objects of the suit, our laws relating to amendments pursued a policy of great liberality and placed a large discretion in the court. The Constitution provides that "In civil causes, when pending, the Superior Court shall have the power, before judgment, of directing, upon such terms as it shall deem reasonable, amendments, impleadings and legal proceedings so that by error in any of them, the determination of causes, according to their merits, shall not be hindered." *Article* 4, § 24, of the *Constitution* of 1897.

Supplementing this declaration of principle, it is provided by statute that "In any civil cause pending before the Superior Court, the said court shall have power, at any time before judgment, to allow amendments either in form or substance, of any process, pleading or proceeding, in such action, on such terms as shall be just and reasonable." *Revised Code, c.* 112, § 11.

From this statement of the law, it appears that the only limitation in point of time that is placed upon an amendment in a pending action, within the discretion of the court, is judgment. Within that limitation, the court in its discretion may allow an amendment whenever it pleases. There · is no suggestion of limitation of amendments such as may be imposed by a statute of limitations. In truth, the court in promulgating rules for pleading has wholly ignored the contemplation of such a limi-

tation, by providing that the plaintiff shall file his declaration on the second rule day after the return day of the writ. In an action for personal injuries, instituted just before the expiration of the year limited by the statute for such actions, the rule day for the plaintiff's declaration occurs after the expiration of the year limited by the statute for the action. If the statute runs to the statement of the cause of action and is not arrested once and for all by the institution of the suit, then in such case the action is barred when the cause thereof is first stated by the original declaration just as effectually as by a subsequent statement in an amended declaration, and there would then be the anomaly of an action instituted within the year and therefore not affected by the statute of limitations and the cause of action thereof stated in an original pleading after the year being barred by the statute.

It is therefore held, that in view of the character and purpose of original process in actions at law in the State of Delaware, the operation of statutes limiting actions at law is arrested at the time when the action is brought and does not extend to the time when the cause of action is stated and that a cause of action that would have been good in law if stated in the original declaration will likewise be good if stated by amendment.

[7] The remaining errors assigned by the plaintiff in error may be considered in groups, and when classified relate to the errors charged to the court in defining and in failing properly to define to the jury the duty the defendant owed the deceased to warn him against danger and the duty the deceased owed himself to avoid danger, and in refusing to give the jury binding instructions to render a verdict for the defendant, upon the grounds, *first*, that the deceased was guilty of contributory negligence; *second*, that no act of negligence on the part of the defendant was shown; *third*, that the preponderance of the evidence was with the defendant; and *fourth*, that the testimony produced for the defendant to disprove negligence was positive, while the testimony for the plaintiff, in proof of negligence, was merely negative.

At the trial of this case there was no dispute as to the character of the place in which the deceased met his death, nor of the

lawfulness of the presence and character of work in which the defendant and the deceased were respectively engaged in that place. The deceased was a mechanic employed by the Pullman Company upon the repair of cars. The defendant was a railroad company engaged in moving and placing cars upon the tracks of the Pullman Company for repair. The place was the yard of the Pullman Company connected with and forming a part of its car works, which was covered by a platform upon which were its private lines of tracks running parallel with and adjacent to its shops. The tracks or lines of railway were not used for traffic or for the transportation of anything except the cars themselves, when being placed in position for the purpose of being altered, repaired or renovated or when being removed therefrom. In this respect the place was an open air workshop, and when considered with reference to the care and caution required of all persons moving about it, differed in no substantial way from an inclosed shop in which the same kind of work is done.

In a preceding review of an earlier trial of this case by the Supreme Court of this state (2 *Boyce*, 356, 80 *Atl.* 617), this court announced as law, that there was imposed upon a railroad company a duty to give warning of the approach and movement of its engines and trains to all persons put in danger thereby, and to give such a warning as under the varied conditions of their operation, shall be timely and sufficient. With a particular reference to the testimony produced at the first trial, which in the main is the same that was presented in the trial now under review, the court further held that it was the duty of the railroad company in giving a warning that there was about to be danger upon a particular track, to give a warning not only to those who were present when the warning was given, but to those who were present when the danger came. It contemplated a warning to all who were put in peril. It was not limited to those who were at work within, upon and under the cars upon the track, but extended to those who otherwise might lawfully come within the zone of the impending danger in ignorance of its existence and of their peril. Around this statement of the law revolved the controversy in the second trial below, the plaintiff below offering testimony to prove that

the deceased could not have heard the first warning, for at the time it was given he was within the shops and out of hearing, that no warning was given subsequent to the first warning, that in the progress of his work and in the exercise of all the care and caution required of him in view of the character and location of his occupation, the deceased came from the shops and walked a distance of about a dozen feet directly to the opening between the two cars by which he was crushed without being then or theretofore warned that shifting was about to be done upon the track he was crossing, and without knowledge thereof from anything in the situation which he could have seen or in law would have been required to see; that while the engine was at the other end of the line of cars it was outside of the yard across the street, and if the deceased had looked, his vision would have been obstructed to a greater or less extent by the presence of a gate or fence dividing the yard from the street, and that even if he had seen the shifter standing outside of the yard or heard its bell ring, there was nothing from such an observation to suggest it was about to do shifting in the yard and to put him on his guard and cause him to heed the instructions of a posted notice to employees not to "pass between the cars while cars are being shifted in the yard." As to the insufficiency of the warning, the plaintiff below produced witnesses who were working in, on or under cars located upon the track where the injury occurred, who testified that they heard and obeyed the warning given from two to four minutes before the accident, but that after that warning, they heard no further warning, although they remained relatively in the same positions in which they were when they heard the first warning.

The defendant below on the other hand produced testimony, that the first warning was given at a time from which it might be inferred that Gatta was in the yard and before he had gone into the shops, that the warning was given both by the call of trainmen and by ringing the bell of the shifter from the time it was first given down to the time Gatta was killed, and that Gatta could or should have heard these warnings, that the shifter was not standing outside of the yard and beyond the street, as shown upon the defendant's own plot, but it was standing partly

within the yard so that Gatta, by looking could have seen it and in law should have been required to see it and to have recognized the purpose and danger of its presence, and that he could have heard the bell and should have recognized it, without confusing it with the sound of other bells, and should have heeded the warning which it gave him.

In this state of the testimony, nearly all of which was conflicting and much of which was irreconcilable, the case was submitted to the jury under the usual instruction by the court relative to conflicting testimony, and out of this testimony, which was considered, and in parts accepted and rejected we assume in the light of such an instruction, the jury evolved a verdict for the plaintiff.

Without reciting the testimony of the case to which the court has given consideration in reaching its conclusion, we consider it sufficient to state that when taken alone, the evidence produced on the part of the plaintiff was sufficient to justify the jury in finding that the injuries to the deceased were occasioned by the negligence of the defendant at a time when the deceased was in the exercise of a care and caution commensurate with the duties of his position and occupation, and that the charge of the court in those respects disclosed no errors either in what was included or omitted.

Opposed to the testimony for the plaintiff and to the inferences it justifies, however, is the testimony for the defendant, which is claimed to be of a weight so much greater and a quality so superior to that produced for the plaintiff, that in law the trial court was bound to instruct the jury to render a verdict for the defendant. From the refusal of the trial court either to grant a new trial or direct a verdict for the defendant, by assuming to determine for which party the testimony preponderated, spring the important errors charged to the court below, namely, that a new trial should have been ordered or a verdict for the defendant should have been directed on the grounds, "third, that the preponderance of the evidence was with the defendant; and fourth, that the testimony produced for the defendant to disprove negligence was positive, while the testimony for the plaintiff, in proof of negligence, was merely negative."

[8] In that branch of the administration of justice in which the courts are called upon to perform the delicate function of directing, sustaining and disturbing the verdicts of juries, without encroaching upon their separate function, courts have adopted for their governance, so far as practicable, certain well considered principles. In the policy of the law of this state, declared by the courts in numberless decisions, the jury is the sole judge of the facts of a case, and so jealous is the law of this policy that by express provision of the Constitution the court is forbidden to touch upon the facts of the case in its charge to the jury. While in jury trials the court may not determine issues of fact from the evidence, the court may, for certain purposes, determine the existence of evidence from which issues of fact may be determined by the jury. By inquiry into the evidence the court will not allow a verdict when the evidence is not sufficient in law to support it, nor will the court sustain a verdict when rendered against the evidence or upon insufficient evidence.

When the evidence in a case is admitted or not controverted and when the law as applied to that evidence is productive of but one legal result, it becomes the duty of the court in the administration of justice, to bind the jury to render a verdict accordingly. To do otherwise would simply entail a postponement of the proper decision of the case, by a retrial ordered on a motion for a new trial, in the event the jury found against the facts. Thus when it appears by a verdict that admitted facts were ignored by the jury, or the instructions upon the law were disregarded, or a clear error of calculation was made, the court will set aside the verdict, or to avoid this, when possible, the court will direct the jury to render the only verdict that could legally be sustained. *Prettyman v. Waples' Exr.* 4 *Harr* 299, 302; *State v. Layton*, 3 *Harr.* 469, 480, 481; *Beeson v. Elliott*, 1 *Del. Ch.* 368; *Waples' Admx. v. Waples*, 1 *Harr.* 394, *note a; Allen v. Miles*, 4 *Harr.* 234; *Bailey v. England*, 1 *Penn.* 12, 39 *Atl.* 455; *Kinney v. Adams*, 2 *Harr.* 357; *Taylor v. Moore*, 3 *Harr.* 6, 7.

[9] But when the case involves a controverted question of fact in which the evidence is conflicting and out of the conflict may be gathered sufficient evidence to support a verdict for either

party, the issue of fact will be left severely to the jury, and the court will neither direct nor disturb the verdict upon the ground that it is against the evidence, though it would have drawn from the testimony a conclusion different from that drawn by the jury. *Burton v. P., W. & B. R. R. Co.*, 4 *Harr.* 252, 254; *State v. Brelawski*, 3 *Boyce*, 416, 84 *Atl.* (*Del.*) 950. The absence or presence of conflicting testimony in a case is therefore a controlling consideration by which courts are governed in directing, sustaining, or overturning the verdicts of juries.

It is contended, however, that as the jury is instructed to find for the party with whom, in the maintenance of the issues, rests the preponderance of evidence, it is likewise the duty of the court, when that preponderance is disclosed at the trial, either to direct a verdict in accordance with it, or after trial, to set the verdict aside, if the verdict be found against it. This in the last analysis would make the court the judge of the facts, and if the judgment of the jury upon the issue of fact were to be anticipated or reviewed by the judgment of the court upon the facts, then the function of the jury in determining issues of fact would cease to be exclusive and would become merely preliminary.

It is the province of the jury in the trial of civil cases to consider the whole volume of testimony, estimate and weigh its value, accept, reject, reconcile and adjust its conflicting parts and be controlled in the result by that part of the testimony which it finds to be of greater weight. As the jury is the exclusive judge of the evidence, it must in reason be the exclusive judge of what constitutes the preponderance of the evidence, and when that judgment is reached upon evidence sufficient to support a verdict, it should not be disturbed by the court. *Smithers v. W. C. Ry. Co.*, 6 *Penn.* 422, 425, 67 *Atl.* 167; *Simeone v. Lindsay*, 6 *Penn.* 224, 65 *Atl.* 778; *Waller v. W. C. Ry. Co.*, 5 *Penn.* 374, 61 *Atl.* 874; *Reed v. Continental Ins. Co.*, 6 *Penn.* 204, 65 *Atl.* 569; *Cecchi v. Lindsay*, 1 *Boyce*, 185, 75 *Atl.* 376; *Lenkewicz v. W. C. Ry. Co.*, 7 *Penn.* 64, 74 *Atl.* 11.

As in the trial of this case there was sufficient evidence to justify the verdict rendered, the court finds no error committed by the trial court either in refusing to direct a different verdict or in refusing to disturb the one rendered.

[10]  Being required to estimate and weigh all the testimony in a case in order to determine where the preponderance lies, juries are frequently required to consider testimony known as positive and negative testimony, and to give to it the peculiar weight and value accorded it by the law.  At the trial of this case the court instructed the jury that "the jury in determining the value of testimony may, and often should, give the greater weight to positive than to negative testimony, but all the testimony should be considered by the jury, and given such weight as in their judgment it is entitled."  To this instruction the defendant below excepted and for error contends, that in view of the negative character of the testimony in proof of negligence and the positive character of the testimony offered to disprove negligence, the trial court should either have directed a verdict in its favor or set aside the verdict rendered against it, and should not have submitted the case to the jury upon the instruction given.

In the case of *Queen Anne's R. R. Co. v. Reed,* 5 *Penn.* 226, 236, 59 *Atl.* 860, 119 *Am. St. Rep.* 301, this court recognized the general rule that positive or affirmative testimony is of greater weight than testimony merely negative, that is, the testimony of a credible witness that he saw or heard a particular thing at a particular time and place is more reliable than that of an equally credible witness who, with the same opportunities, testifies that he did not hear or see the same thing at the same time and place. 1 *Whart. Ev.* § 415; *Stark. Ev.* 867; *Jones, Ev.* § 901.  The reason for the rule is that the witness who testifies to a negative may have forgotten what actually occurred, while it is impossible for the witness who testifies affirmatively to remember what never existed. *Stitt v. Huidekoper,* 17 *Wall.* 384, 21 *L. Ed.* 644.  Negative testimony may be attributed to lack of attention, inert mental operations, imperfect senses as well as to the faulty recollection of the witness, while on the contrary, given under circumstances that disclose the witness to have been mentally alert, of perfect senses and excellent memory, and showing the opportunities of the witness for knowing and the attention he had given the matter concerning which he testifies, negative testimony may lose its negligible quality and outweigh positive testimony.  *Greany v.*

*Long Island Ry. Co.,* 101 *N. Y.* 419, 5 *N. E.* 425; *Lighthouse v. C., M. & St. P. Ry. Co.,* 3 *S. D.* 518, 54 *N. W.* 320; *Kelley v. Schupp,* 60 *Wis.* 76, 18 *N. W.* 725; *Nelson v. Iverson,* 24 *Ala.* 9, 60 *Am. Dec.* 442; *Stoddard v. Kelly's Admr.* 50 *Ala.* 452; *State v. Gates,* 20 *Mo.* 400; *Van Salvellergh v. G. B. T. Co.,* 132 *Wis.* 166, 111 *N. W.* 1120; *Stotler v. Railway Co.,* 200 *Mo.* 107, 98 *S. W.* 509; *Pence v. C., R. I. & P. Ry. Co.,* 79 *Iowa,* 389, 44 *N. W.* 686; *Davis v. N. Y., N. H. & H. Ry. Co.,* 159 *Mass.* 532, 34 *N. E.* 1070; *Eilert v. G. B. & M. Ry. Co.,* 48 *Wis.* 606, 4 *N. W.* 769; *Elkins v. Kenyon,* 34 *Wis.* 93; *Purnell v. Railway Co.,* 122 *N. C.* 832, 29 *S. E.* 953; *C. & A. Ry. Co. v. Dillon,* 123 *Ill.* 570, 15 *N. E.* 181, 5 *Am. St. Rep.* 559.

The courts in different jurisdictions have frequently recognized a qualification of the general rule that positive testimony is of greater weight than negative testimony. *Potts v. House,* 6 *Ga.* 324, 50 *Am. Dec.* 329; *Innis v. State,* 42 *Ga.* 482; *M. D. M. Co. v. Harkenson,* 84 *Iowa,* 117, 50 *N. W.* 559; *Burnham v. Sherwood,* 56 *Conn.* 229, 14 *Atl.* 715; *Cotton v. Railway Co.,* 99 *Minn.* 366, 109 *N. W.* 835, 8 *L. R. A.* (*N. S.*) 643, 116 *Am. St. Rep.* 422, 9 *Ann. Cas.* 935; *People v. Sanders,* 114 *Cal.* 216, 46 *Pac.* 153; *LeCointe v. U. S.,* 7 *App. D. C.* 16; *McMahon v. McCabe,* 174 *Mass.* 320, 54 *N. E.* 854; *State v. Lattin,* 19 *Wash.* 57, 52 *Pac.* 314.

The varying qualities of negative testimony under different conditions were recognized by this court in the case of *Queen Anne's R. R. v. Reed,* in which the opinion of the court in *Menard v. B. & M. R. R. Co.,* 150 *Mass.* 386, 23 *N. E.* 214, was cited to illustrate its meaning. In that case the court said: "Ordinarily all that a witness can say, in such a case, when called to prove that a bell was rung, is that he did not hear it. Such a statement, with no accompanying facts, is merely negative, and of no value as evidence. But attending circumstances may be shown, which make the statement strong affirmative evidence. It may appear that all the attention of which the witness was capable was concentrated on the effort to ascertain whether the bell was rung, and his failure to hear it could only have been because it made no sound. A witness may be in any conceivable attitude of attention or inattention, which will give his evidence value, or leave it with little or no weight."

The rule of law that positive testimony is of greater weight than negative testimony, considered, of course, in connection with its exceptions and qualifications, is undisputed. We are now asked however, to enlarge the rule and hold in substance that because a jury should ordinarily give to positive testimony greater weight than to negative testimony, the court, on motion for binding instructions or for a new trial, should see that the rule is enforced, and should examine into the character of the testimony of the two classes, judge their relative values, determine whether the positive testimony outweighs and destroys the probative force of the negative testimony, and direct or overturn a verdict accordingly. In support of this contention these authorities are cited: *Seibert v. Erie Ry Co.*, 49 *Barb.* (*N. Y.*) 583; *Lomer v. Meeker*, 25 *N. Y.* 363; *Culhane v. N. Y. C. & H. R. R. Co.*, 60 *N. Y.* 134; *Foley v. N. Y. C. & H. R. R. Co.*, 197 *N. Y.* 430, 90 *N. E.* 1116, 18 *Ann. Cas.* 631; *Keiser v. L. V. R. R. Co.*, 212 *Pa.* 409, 61 *Atl.* 903, 108 *Am. St. Rep.* 872; *Lonzer v. L. V. R. R. Co.*, 196 *Pa.* 610, 46 *Atl.* 937; *Horandt v. C. R. R. Co.*, 78 *N. J. Law*, 190, 73 *Atl.* 94; *Holmes v. P. R. R.*, 74 *N. J. Law*, 469, 66 *Atl.* 412, 12 *Ann. Cas.* 1031; *Hubbard v. B. & A. R. Co.*, 159 *Mass.* 320, 34 *N. E.* 459; *Menard v. R. R. Co.*, 150 *Mass.* 387, 23 *N. E.* 214; *Bohan v. Milwaukee Ry. Co.*, 61 *Wis.* 391, 21 *N. E.* 241; *Horn v. B. & O. R. R. Co.*, 54 *Fed.* 301, 4 *C. C. A.* 346; *B. & O. R. R. Co. v. Baldwin*, 144 *Fed.* 53, 75 *C. C. A.* 211.

A close analysis of these authorities will disclose, that in those cases in which there was negative testimony and verdicts were either directed or set aside, it was done not because the testimony was negative in quality nor because the negative testimony was opposed by positive testimony, but because the negative testimony was in itself without probative force sufficient to support the verdicts.

Considering the rule in the light of these and other decisions, it is apparent that in a case where the issue on one side is supported solely by negative testimony, but by negative testimony of sufficient probative force, in the estimation of the court, to prove the issue, and there is opposed to it no testimony at all, no court would prevent or disturb a verdict based upon such testimony

27 Del.]     P., B. & W. R. R. Co. vs. GATTA.     61

Opinion.

merely because of its negative character. And if the same negative testimony of the same probative force was opposed by positive testimony, a court would not take a case from the jury or overthrow its verdict simply because of the rule in favor of positive testimony, for the effect of that would be to deprive the rule of its recognized exceptions and to hold that positive testimony outweighs negative testimony in every case. But when negative testimony is opposed by positive testimony and the negative testimony, if unopposed, would in itself be insufficient to support the issue it is offered to prove, the court will direct or overturn a verdict, not by encroaching upon the exclusive function of the jury and weighing each class of testimony, one against the other, but by performing its own exclusive function of determining, as in all cases, whether the evidence introduced in proof of the issue was sufficient to support a verdict.

Considered in this light, the rule that positive testimony outweighs negative testimony was not intended to come in conflict with the rule that the weight of the testimony, when conflicting, should be left to the jury (*Jones, Ev.* 901), but was designed as a rule of measurement for use by the jury, and when testimony, negative in quality, is submitted to the jury with the circumstances surrounding and corroborating it, to be weighed and valued according to this and other rules of evidence, and when in itself, it is of sufficient probative force to support a verdict, though opposed by positive testimony to which the jury may give a lesser weight, a verdict will neither be directed nor disturbed.

[11] The opportunities of the witnesses who gave negative testimony in this case, to hear, comprehend and remember a warning if one had been given when Gatta was within sound of such a warning, considered with relation to their positions, occupations, surroundings and knowledge of the character of the impending danger, were such as to take their testimony entirely out of the class that is purely negative and to justify the jury in giving it a weight upon which to predicate the verdict it rendered. The trial court therefore committed no error in refusing to direct a verdict or to disturb the verdict rendered because of the negative character of the testimony for the plaintiff.

Judgment Affirmed.

The judgment and proceedings of the court below are in all respects affirmed.