**Tammera L.C. McCOOL and Paul McCool, Plaintiffs Below, Appellants,**

v.

**John F. GEHRET, M.D., Defendant Below, Appellee.**

**No. 220,1994.**

Supreme Court of Delaware.

Submitted: March 21, 1995.

Decided: April 28, 1995.

Bruce L. Hudson, Wilmington, for appellants.

Warren B. Burt (argued), and Michael F. Duggan of Burt & Burt, Wilmington, for appellee.

Before WALSH, HOLLAND, HARTNETT, BERGER, JJ., and DUFFY, J., Retired [1] (constituting the Court *en banc*).

HOLLAND, Justice:

This is an appeal from the Superior Court. In their original complaint, the plaintiffs-appellants, Paul and Tammera McCool (the "McCools") alleged medical negligence by the defendant-appellee, John Gehret, M.D. ("Dr. Gehret"), and certain other health care providers. The *complaint was amended to al-lege tortious interference by Dr. Gehret with the plaintiffs' medical expert witness, Robert Dein, M.D. ("Dr. Dein"). Over the plaintiffs' objection, the Superior Court granted Dr.

---

**1.** Sitting by designation pursuant to Supreme Court Rule 2 and Del. Const., art. IV, §§ 12 and 38.

Gehret's motion to sever the trial of the McCools' claim for medical malpractice from the trial of their claim for tortious interference.

A jury trial was held on the medical malpractice claim only, beginning on January 18, 1994. The jury returned a verdict in favor of Dr. Gehret on January 26, 1994. On February 3, 1994, the plaintiffs filed a motion for a mistrial or, in the alternative, a new trial.

On April 20, 1994, a one-day bench trial was held regarding the tortious interference claim. This bench trial was held before a different Superior Court judge than the one who had presided at the malpractice trial. Nevertheless, the first judge was called to testify on behalf of Dr. Gehret regarding the McCools' tortious interference claim.

On June 3, 1994, the second judge entered judgment in Dr. Gehret's favor on the tortious interference claim. On that same day, the first judge, who had presided at the malpractice trial, denied the McCools' motion for a mistrial or a new trial. The Superior Court entered final judgment in favor of Dr. Gehret in the entire proceeding.

The McCools have appealed the judgments entered in Dr. Gehret's favor on both claims. The McCools raise eight contentions in this appeal. First, the Superior Court improperly granted the defendant's motion *in limine* to preclude evidence at the malpractice trial regarding Dr. Gehret's alleged use of alcohol. Second, the Superior Court abused its discretion in severing the trial of the medical malpractice claim from the trial of the tortious interference claim. Third, the Superior Court erred in granting the motion *in limine* to exclude from the malpractice trial evidence that Dr. Gehret attempted to intimidate Dr. Dein. Fourth, the jury's verdict in Dr. Gehret's favor in the medical malpractice claim was contrary to the weight of the evidence. Fifth, the Superior Court erred in failing to adequately investigate an allegation of potential juror misconduct. Sixth, it was error for the judge who presided over the malpractice trial to testify for Dr. Gehret in the tortious interference trial, especially when the motion for a new trial on the medical malpractice claim remained pending. Seventh, the McCools were denied their right to a jury trial regarding their tortious interference claim. Eighth, the Superior Court erred in failing to award the plaintiffs nominal damages plus punitive damages in their tortious interference claim.

This Court has concluded that the Superior Court erred in excluding evidence from the malpractice trial relating to Dr. Gehret's indirect communications with the plaintiffs' expert medical witness, Dr. Dein. It was also reversible error for the judge who presided over the malpractice trial to testify as a witness at the tortious interference trial. Additionally, the record reflects that the McCools were improperly denied their right to a jury trial regarding their tortious interference claim. Accordingly, the judgments of the Superior Court in favor of Dr. Gehret on both the medical malpractice claim and the tortious interference claim must be reversed.[2]

## FACTS

### *Labor and Delivery*

On the morning of Sunday, October 22, 1989, at approximately 10:00 a.m., Mrs. Tammera McCool ("Mrs. McCool") telephoned her treating obstetrician, Dr. Gehret. She informed him that she was experiencing the preliminary onset of contractions. Dr. Gehret told her to call back through his answering service when her labor became more serious.

Later in the afternoon, Mrs. McCool again telephoned Dr. Gehret and described her symptoms to him. He advised her to go to the Medical Center of Delaware. Mrs. McCool was admitted as a patient at approximately 5:20 p.m. She was accompanied by her husband, Paul McCool, and her father-in-law.

At 8:00 p.m., Dr. Gehret arrived at the Medical Center and examined Mrs. McCool. After Dr. Gehret's initial examination of Mrs.

2. This Court finds it unnecessary to address the other contentions the McCools raise, some of which are now moot. The original rulings on the remaining issues that are not moot, however, should not be deemed to be the law of the case when the matter is remanded for a new trial.

McCool, he continued to monitor her progress every thirty to forty-five minutes until approximately midnight when Mrs. McCool became fully dilated. At 1:30 a.m., after the labor had failed to progress, Dr. Gehret attempted to complete a vaginal delivery by forceps. He determined, however, that a cephalopelvic disproportion would prevent a vaginal delivery.

Dr. Gehret then performed a caesarian section and delivered a healthy baby boy at approximately 2:00 a.m., Monday, October 23. After the delivery, Dr. Gehret noticed bleeding from the right side of the incision as he was suturing Mrs. McCool. The record reflects that the source of the bleeding was likely a tear resulting from the removal of the baby. There was no contention by any witness that the development of such bleeding was medical negligence. Dr. Gehret sutured the bleeding area, determined the bleeding had stopped, and then completed the closure of Mrs. McCool's incision.

## Post–Delivery Condition
## Mrs. McCool Deteriorates

Following the delivery, Mrs. McCool was taken to the recovery room. Her vital signs were examined and found to be normal. Her blood pressure was 80/52 and her pulse was 100. Dr. Gehret checked on Mrs. McCool before he left the hospital at 2:40 a.m. to go home.

Shortly after Dr. Gehret's departure, Mrs. McCool's blood pressure declined to 75/40 and her pulse increased to 110. From 3:00 a.m. until 4:30 a.m., doctors on the Medical Center's staff took several steps in an attempt to correct Mrs. McCool's worsening condition. Nevertheless, no improvement occurred. Mrs. McCool's blood pressure dropped to 50/35 and her pulse to 95.

Dr. Gehret was called at home at 4:30 a.m. He was advised of Mrs. McCool's condition by Dr. Cherie Johnson ("Dr. Johnson"), a resident physician on duty in the obstetrical unit. Dr. Gehret requested that certain

blood tests be performed. He asked to be informed of the results.

At approximately 6:30 a.m., Dr. Gehret was called at home again. He was advised that Mrs. McCool's blood tests revealed a critically low platelet count. With such a low platelet count, Mrs. McCool's blood lacked the ability to clot. Without a clotting capacity, Mrs. McCool could not have further surgery. At 6:45 a.m., Dr. Gehret authorized infusion of additional platelets to prepare Mrs. McCool to be taken back into surgery.

Dr. Gehret returned to the hospital at 8:00 a.m. At 9:15 a.m., Dr. Gehret noted that Mrs. McCool was obviously having intra-abdominal hemorrhaging following the caesarian section. Mrs. McCool's platelet level eventually became re-established so that further surgery could be performed. At 10:20 a.m., Mrs. McCool was taken to the operating room. By this time, her condition was life threatening.

## Emergency Surgery
## Right Ovary and Uterus Removed

Dr. Gehret performed an emergency exploratory laparotomy. He discovered that a large volume of blood had accumulated in Mrs. McCool's abdomen.[3] Dr. Gehret was initially assisted by Dr. Charles Whitney ("Dr. Whitney"), an oncological surgeon, and Dr. Johnson. Dr. Whitney testified that he found a "bleeder," sutured it, and left the operating room before surgery was completed.

Dr. Gehret testified that there was bleeding from more than the one source. Dr. Gehret thought one origin of the bleeding was in the area of the right ovary. He removed that ovary but the bleeding persisted. He was concerned that if he did not resolve the bleeding, Mrs. McCool would die, since she could probably not survive a third surgery.[4] Dr. Gehret examined Mrs. McCool's uterus and found it "boggy" with blood. Troubled by the apparent inability of the uterus to contract and concerned that it would cause further complications, Dr. Geh-

---

3. It was later determined that the equivalent of Mrs. McCool's total body blood volume had bled into her abdomen.

4. According to Dr. Gehret, Mrs. McCool was the most critically ill patient he had ever treated.

ret deemed it necessary to remove the uterus.

Surgery was then completed. Mrs. McCool was discharged from the hospital several days later. She has suffered no further medical complications. The removal of her uterus has, however, rendered her sterile.

### Mrs. McCool Changes Physicians
### Medical Malpractice Alleged

After her discharge, Mrs. McCool returned to the care of her former obstetrician/gynecologist, Dr. Dein. Dr. Dein is licensed to practice medicine in Pennsylvania. He is a member of the medical staff of the Bryn Mawr Hospital. During an office visit with Dr. Dein, Mrs. McCool told him about her ordeal during childbirth.

Dr. Dein subsequently reviewed the medical records relating to the delivery of Mrs. McCool's son. Dr. Dein concluded that Mrs. McCool's internal bleeding should not have been allowed to persist for eight hours until she was near death. In addition, Dr. Dein maintained that once Mrs. McCool was readmitted to surgery, her bleeding could have been controlled without the removal of her right ovary and uterus.

Dr. Dein had never before served as an expert witness in a medical malpractice suit. He agreed, however, to help Mrs. McCool in a law suit she filed against Dr. Gehret. Dr. Dein wrote a report that was sharply critical of Dr. Gehret's medical care and treatment of Mrs. McCool.

On May 23, 1991, Mrs. McCool and her husband filed a medical malpractice suit against Dr. Gehret, the Medical Center, and the attending resident, Dr. Johnson.[5] Their original complaint alleged that Dr. Gehret was negligent, first, in permitting Mrs. McCool to hemorrhage for eight hours; and, second, in removing Mrs. McCool's uterus and right ovary without medical justification. The McCools relied upon Dr. Dein's report to support their allegations.

### McCools' Medical Expert
### Dr. Gehret's Indirect Communications

Dr. Gehret became aware of Dr. Dein's report in the fall of 1991. He found the tone of the report derogatory. In November 1991, Dr. Gehret telephoned an acquaintance on the medical staff at the Bryn Mawr Hospital, Dr. Stephen Krell ("Dr. Krell"). Dr. Gehret testified that he was interested in Dr. Krell's estimation of Dr. Dein and wanted to ascertain Dr. Dein's motive in writing a report filled with "outrageous statements."

Dr. Gehret also asked Dr. Krell to speak to Dr. Dein about his role in the case, knowing that Dr. Dein intended to serve as the plaintiffs' expert witness. Dr. Krell apparently felt uncomfortable complying with Dr. Gehret's request and did nothing in response. After Dr. Gehret contacted Dr. Krell by telephone a second time, however, Dr. Krell complied with Dr. Gehret's request.

In December 1991, following the second phone call from Dr. Gehret, Dr. Krell approached Dr. Dein in the physicians' locker room at the Bryn Mawr Hospital. According to Dr. Dein, Dr. Krell informed him that Dr. Gehret had asked him twice to relay the message that it was inappropriate for doctors to testify against doctors.[6] Dr. Dein believed the message was intended to coerce or intimidate him into not testifying.

On April 1, 1992, Dr. Dein was deposed. On that same day, Mrs. McCool asked Dr. Dein to help her locate a Delaware physician to assist as an expert witness in her litigation. Dr. Dein refused, indicating that he was uncomfortable and felt it would not be in his best interest to become more involved in her lawsuit. Dr. Dein assured Mrs. McCool, however, that he still intended to serve as her expert medical witness at trial.

### Complaint Amended
### Tortious Interference Alleged

On January 19, 1993, the McCools amended their original complaint to add a second cause of action against Dr. Gehret for tor-

---

5. The McCools' claims against the Medical Center and Dr. Johnson were dismissed before trial.

6. For a discussion of the phenomenon known as the "conspiracy of silence," see *Trull v. Long,* Ala.Supr., 621 So.2d 1278 (1993).

tious interference. The McCools alleged that Dr. Gehret's conduct in conveying a message to Dr. Dein constituted the common law tort of intentional interference with their legally protected right to call witnesses on their behalf. The parties continued to prepare for a trial.

In November 1993, the McCools' attorney and Dr. Krell had a telephone conversation concerning Dr. Krell's "attempted intimidation" of Dr. Dein. Later that night, Dr. Krell telephoned Dr. Dein at home. Dr. Krell informed Dr. Dein that he was surprised and disappointed to have learned that Dr. Dein had remained involved in the McCools' suit. In response, Dr. Dein told Dr. Krell that he was reconsidering his involvement. Dr. Dein perceived the telephone conversation as threatening. Following that conversation, Dr. Dein decided not to testify at trial as an expert witness for the McCools.

### Dr. Gehret's Pretrial Motion
### Severance Granted/Evidence Excluded

The McCools' suit against Dr. Gehret was scheduled for trial on January 18, 1994. On December 15, 1993, Dr. Gehret filed a motion *in limine.* Dr. Gehret requested that the Superior Court sever the trial of the McCools' tortious interference claim from the trial of their medical malpractice claim.

The McCools challenged Dr. Gehret's motion to sever the trial of their two claims. They argued that the evidence concerning Dr. Gehret's attempt to intimidate their expert witness was relevant to the medical malpractice case. According to the McCools, that evidence was admissible to impeach Dr. Gehret's credibility and because it manifested Dr. Gehret's "state of mind and his culpability."

On December 30, 1993, the Superior Court granted Dr. Gehret's motion. The Superior Court ordered the claims severed because it was persuaded that trying the two claims together would unfairly prejudice Dr. Gehret and could be confusing to the jury. According to the Superior Court, the tortious interference claim necessarily included an assessment of the effect of the intimidation efforts in harming the McCools' medical malpractice

suit. Therefore, it ruled that the claims should be heard separately. Because much of the same evidence pertained to both claims, however, the Superior Court offered to explore the possibility of retaining the same jury to hear both claims consecutively, or, in the alternative, holding the medical malpractice trial before a jury, followed by a bench trial of the tortious interference claim.

Subsequent to his successful motion to sever the McCools' claims, Dr. Gehret requested that the Superior Court preclude the McCools from referring in any manner, in the medical malpractice trial, to his alleged attempt to intimidate Dr. Dein. The Superior Court again granted Dr. Gehret's motion *in limine,* citing many of the same reasons that had persuaded it to separate the trial of the two claims (e.g., potential for juror confusion, possibility of inciting an inflammatory response, and undue prejudice to Dr. Gehret). The Superior Court also questioned the relevance to the malpractice claim of Dr. Gehret's attempted intimidation of the McCools' expert witness.

### Medical Malpractice Trial

On January 16, 1994, two days before the medical malpractice trial was to begin, Mrs. McCool contacted Dr. Dein. She apparently pleaded with him to reconsider his decision not to testify. According to Dr. Dein, he felt guilty and, in an act of conscience, agreed to appear on Mrs. McCool's behalf as an expert witness. The McCools' attorney had no time to meet with Dr. Dein and prepare him as a witness for trial.

The medical malpractice trial commenced on January 18, 1994 and lasted several days. The testimony at trial regarding the standard of care was conflicting. Dr. Dein and a second Pennsylvania-licensed physician, Dr. Marshall Klavan, testified as expert witnesses on the McCools' behalf. Both testified that Dr. Gehret had violated the standard of care in a number of respects but most significantly by not responding earlier to Mrs. McCool at the hospital and in removing her uterus and right ovary.

Dr. Gehret testified on his own behalf. His testimony was supported by the expert

testimony of Dr. Moses Hochman, a Delaware-licensed physician. According to Dr. Hochman, Dr. Gehret's treatment of Mrs. McCool met the standard of care required of physicians in Delaware.

On January 25, 1994, just before trial resumed after a break, the McCools had a brief conversation with a female New Castle County police officer. The officer stated that she had been delivered by Dr. Gehret and was there to observe the trial. The officer said she had heard about the trial from an acquaintance who was a member of the jury. The juror had apparently also told the officer he could not discuss the trial with her. The McCools' attorney presented the foregoing information to the trial judge but did not make an application for any action to be taken at that time.

The medical malpractice trial continued. At the trial's conclusion, the jury returned a verdict in Dr. Gehret's favor. Due to the length of the trial, the Superior Court dismissed the jurors, thus preventing that jury from hearing the McCools' second claim of tortious interference. In lieu of presenting much of the same evidence before a new jury, the McCools waived their right to a jury trial on the basis that their tortious interference claim would be a bench trial before the Superior Court judge who had presided over the medical malpractice trial.

The McCools also moved for a new trial of their medical malpractice claim on three grounds. First, the McCools alleged that the verdict was against the great weight of the evidence; second, that the mid-trial contact with the police officer evidenced juror misconduct; and, third, that the Superior Court erred in severing the trial of the tortious interference claim from the trial of the medical malpractice claim.

### Tortious Interference Trial
### Original Trial Judge Testifies

The date set for the bench trial of the tortious interference claim was April 20, 1994. On April 19, the parties were informed that the original trial judge would be unable to try the tortious interference claim due to a scheduling conflict with another matter, but that a second Superior Court

judge would be available. That information was conveyed to the parties in an unreported telephone conversation.

The following is purportedly what transpired during that telephone conversation. Both parties initially objected to trying the claim before a new judge and asked for a continuance until the original trial judge would be available. At this point, the original trial judge volunteered to appear as a witness at the tortious interference trial, during a break in the other conflicting matter. Dr. Gehret's attorney accepted the judge's offer to testify and withdrew his objection to proceeding before the second judge. The McCools continued to object but the original trial judge denied their motion for a continuance of the tortious interference claim.

On April 20, 1994, a one-day bench trial was held on the tortious interference claim before a second Superior Court judge. Several witnesses testified. The original trial judge was called as a witness by Dr. Gehret and opined that Dr. Dein had been a "very effective witness for the plaintiff[s]." At the time the original trial judge testified, the McCools' motion for a new trial in the medical malpractice case was still pending.

On June 3, 1994, the second Superior Court judge who presided over the tortious interference trial issued a decision. The second trial judge found Dr. Gehret's conduct in attempting to intimidate the plaintiffs' expert witness to be reprehensible. Nevertheless, judgment was entered in Dr. Gehret's favor because Dr. Dein had retracted his decision not to testify and the McCools had suffered no injury from Dr. Gehret's efforts to intimidate. In reaching the "no injury" aspect of that decision, the second trial judge relied, in large part, on the original trial judge's opinion that Dr. Dein had been a very effective witness.

### New Trial Denied

On June 3, 1994, having heard oral argument on May 19, 1994, the original trial judge issued a decision denying the McCools' motion for a new trial on the malpractice claim. First, the original trial judge found there was sufficient evidence to support the

jury's verdict in Dr. Gehret's favor. Second, the judge found the plaintiffs had waived their right to allege juror misconduct when their attorney failed to request the court to take action at the time and that, regardless, there was insufficient evidence to suggest improper conduct by the juror. Finally, the judge held the decision to sever the claims was justified because the causes of action were unrelated, dealt with different periods of time, and involved distinctly different evidence. The judge again concluded that trying the medical malpractice and the tortious interference claims together would have unfairly prejudiced Dr. Gehret and confused the jury.

## WITNESS INTIMIDATION EFFORTS ADMISSIBLE AS SUBSTANTIVE EVIDENCE

■ In support of his motion to sever the malpractice claim from the tortious interference claim, Dr. Gehret's attorney argued that "there is the tremendous danger that the jury would read into Dr. Gehret's alleged actions [in sending the message to Dr. Dein] an implicit concession of liability in the medical malpractice claim, resulting in irreversible prejudice." The Superior Court agreed. It granted Dr. Gehret's motion to sever on the basis that there was "far too much opportunity for confusion among the jurors [and] for an inflammatory response from the jury."

After the Superior Court granted the motion to sever, Dr. Gehret's attorney petitioned the court to preclude the McCools from offering any evidence in the malpractice trial of Dr. Gehret's efforts to interfere with Dr. Dein. The Superior Court granted this motion as well, ruling that evidence of the intimidation efforts was inadmissible because it was unduly prejudicial to Dr. Gehret. D.R.E. 403. Alternatively, the Superior Court viewed the evidence regarding Dr.

Gehret's intimidation efforts as irrelevant to the McCools' malpractice claim against Dr. Gehret.

This Court has held that "attempts to improperly influence a witness' testimony are fundamentally unfair and pervert the truth-seeking function of trial." *Weber v. State,* Del.Supr., 457 A.2d 674, 679 n. 6 (1983). Similarly, the second trial judge condemned Dr. Gehret's conduct:

> [Dr.] Gehret's behavior in vicariously conveying insinuating messages to [Dr.] Dein by way of [Dr.] Krell was reprehensible. Surely this conduct is not within the scope of acceptable means to defend a suit properly before the Court.

Thus, Dr. Gehret was undoubtedly correct that the jury may have reacted adversely to the evidence of his efforts to intimidate Dr. Dein.

Nevertheless, it is precisely because of the egregious nature of such conduct that the law expressly permits the jury to make adverse inferences from a party's effort to intimidate witnesses or otherwise suppress probative evidence against him. According to McCormick:

> [W]rongdoing by the party in connection with its case ... is also commonly regarded as an admission by conduct. By resorting to wrongful devices, the party is said to provide a basis for believing that he or she thinks the case is weak and not to be won by fair means.... Accordingly, the following are considered under the general category of admissions by conduct ... undue pressure by bribery, intimidation, or other means to influence a witness to testify favorably or to avoid testifying; ...

*McCormick on Evidence* § 265 (John W. Strong, et al. eds., 4th ed. 1992). *Accord* 2 John H. Wigmore, *Wigmore on Evidence* § 278(2) (Chadbourn Rev.1979).[7]

---

7. Wigmore states:

It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is

a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the case, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.

2 John H. Wigmore, *Wigmore on Evidence* § 278(2) at 133 (Chadbourn Rev.1979).

The Maryland Court of Special Appeals, confronted by facts similar to those *sub judice*, applied the venerable legal principles described by Wigmore and McCormick. *Meyer v. McDonnell*, 40 Md.App. 524, 392 A.2d 1129, 1134 (1978). In *Meyer*, two expert witnesses were scheduled to testify against a doctor in a medical malpractice trial. The doctor telephoned associates of each witness and asked them to call the witness and communicate intimidating statements. Notwithstanding the doctor's efforts, both witnesses ultimately testified as experts for the plaintiff. In *Meyer*, the court held that evidence of the doctor's efforts at intimidation was:

admissible as tending to show his consciousness of the weakness of his case and a belief that his defense would not prevail without the aid of such improper and unfair tactics as those in which he engaged. This, in conjunction with the other evidence in the case, may lead to the further inference that appellee considers his case to be weak because he, in fact, is guilty of the negligence which appellant asserts he committed. Such inferences are, of course, merely permissible and the jury is free to either accept or reject them as it sees fit.

*Id.* *Accord DiLeo v. Nugent*, 88 Md.App. 59, 592 A.2d 1126 (1991); *Miller v. Montgomery County*, 64 Md.App. 202, 494 A.2d 761, *cert. denied*, 304 Md. 299, 498 A.2d 1185 (1985). The holding, in *Meyer*, that an attempt to intimidate a witness is admissible as tending to show a party's consciousness of the weakness of his or her case, has recently been reaffirmed. *Shpak v. Schertle*, 97 Md.App. 207, 629 A.2d 763, *cert. denied*, 333 Md. 201, 634 A.2d 62 (1993). The court stated further, "*Meyer* does not require the underlying testimony to be otherwise relevant; rather, it provides that testimony of spoliation is, in and of itself, substantive evidence in support of the other party's claim." *Id.* 629 A.2d at 772.

■ Thus, a party's efforts to interfere with a witness are not simply admissible as impeachment evidence of the tampering party's credibility. *Meyer v. McDonnell*, 392 A.2d at 1134. The opposing party is entitled to introduce facts regarding efforts to intimi-

date a witness as *substantive evidence*. Although such evidence may not be sufficient to establish a *prima facie* case, it has probative value with respect to the tampering party's consciousness of the weakness of his or her position on the merits and may be considered by the jury for that purpose. *See* 18 *Del.C.* § 6853. *Accord Meyer v. McDonnell*, 392 A.2d at 1134. Consequently, from the evidence of interference and the other evidence in this case, the jury could infer that Dr. Gehret considered his case to be weak because he was, in fact, guilty of the negligence which the McCools alleged. *Meyer v. McDonnell*, 392 A.2d at 1134.

■ The condition precedent to admitting evidence of interference with a witness is a demonstration that the acts alleged are attributable to the opposite party and that the acts alleged were done with the intent to interfere. *See* David B. Harrison, Annotation, *Admissibility and Effect, on Issue of Party's Credibility or Merits of his Case, of Evidence of Attempts to Intimidate or Influence Witness in Civil Action*, 4 A.L.R.4th 829 (1981). In this case, the second trial judge ruled:

Having heard [Dr.] Gehret's testimony and observed his demeanor at trial, the Court finds that [Dr.] Gehret's characterization of his discussions with [Dr.] Krell was disingenuous. The Court concludes that the defendant's act of calling Dr. Krell was an intentional attempt to relay a message to [Dr.] Dein and to influence him concerning his participation in Mrs. McCool's case.

Once a sufficient showing is established, the evidence of interference is presented to the jury, along with appropriate instructions from the trial judge. The jury can then either reject or accept that evidence. If the evidence is accepted by the jury, it may support an inference that the party charged with interference is conscious of the weakness or unjust nature of his or her case. Accordingly, it may be considered as substantive evidence in support of the other party's claim, e.g. negligence in this case.

This Court has held that excluding evidence of efforts to influence a witness' testimony constitutes reversible error. *Weber v.*

*State,* Del.Supr., 457 A.2d 674 (1983).[8] Even though evidence of Dr. Gehret's efforts to intimidate the McCools' expert witness would have been prejudicial to his case, it was the abhorrent nature of such conduct that made it admissible. In the case *sub judice,* the McCools were absolutely entitled to introduce the evidence of Dr. Gehret's attempt to intimidate Dr. Dein as substantive evidence during the trial of their medical malpractice claim. *See Meyer v. McDonnell,* 392 A.2d at 1134. *See also McQueeney v. Wilmington Trust Co.,* 779 F.2d 916 (3d Cir.1985). *Cf. Weber v. State,* 457 A.2d at 678–83. The Superior Court's decision to exclude from the malpractice trial the evidence that Dr. Gehret attempted to interfere with the McCools' expert witness was reversible error. *Accord Weber v. State,* 457 A.2d 674.

## JUDGE AS WITNESS TESTIMONY INADMISSIBLE

■ The McCools contend that it was reversible error *per se* for the Superior Court judge who presided over the trial of their malpractice claim to testify for Dr. Gehret at the subsequent trial of their tortious interference claim. In support of that position, the McCools rely, in part, on Delaware Uniform Rule of Evidence 605, which provides:

The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point.

Generally, the Delaware Uniform Rules of Evidence are patterned on the Federal Rules of Evidence. Specifically, Delaware's Rule 605 tracks its same numbered federal counterpart. Two decisions made by the drafters of the Federal Rules reflect the policy underlying Rule 605:

First, [the drafters] rejected the notion that the presiding judge is generally competent to testify. Second, they disqualified the presiding judge from testifying in any case, thus declining to follow the partial competency approach employed by other codes.

27 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6062 (1990).

In the case *sub judice,* the President Judge of the Superior Court specially assigned the entire proceeding between the McCools and Dr. Gehret to the original trial judge. Super.Ct.Civ.R. 40. The President Judge entered a pre-trial order stating "the above-captioned case is specially assigned to you [the original trial judge] *for all purposes until final disposition.*" (emphasis added). Dr. Gehret argues that the original trial judge was, nevertheless, competent to testify for him as a witness because a second judge was "presiding at the trial" of the McCools' tortious interference claim. That argument has been anticipated and answered by the leading commentators on the Federal Rules of Evidence.

[I]t may be argued that when Rule 605 disqualifies the judge "presiding at the trial," the rule uses the present, not past, tense. This suggests that prior involvement as presiding judge even at the same trial is immaterial so long as that status has terminated by the time the testimony is given. However, there is no evidence that the drafters ever attributed such subtlety of meaning to the language employed in the rule. The limited authority on point suggests that a judge should be disqualified under Rule 605 [from testifying] in such a situation, even if his involvement was limited to proceedings prior to commencement of trial.

27 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6063 (1990). Consequently, those same commentators opined that:

[W]hen a judge presides over the beginning of a trial, is replaced by another judge, and is then called to testify at the same trial. . . . if the judge-witness made any rulings in the case that are still con-

---

8. In *Weber,* the Superior Court had excluded evidence that a victim's family had paid witnesses for the State. This Court reversed the defendant's conviction because excluding the evidence denied the defendant his right to impeach the credibility of the witnesses against him.

*Weber v. State,* 457 A.2d at 679–82. Interference with a witness by a party, however, is admissible as substantive evidence against the party, not merely as impeachment evidence against the witness. *Meyer v. McDonnell,* 392 A.2d at 1134.

trolling, the subsequent testimony of that individual may destroy the appearance of impartiality since the rights of the parties have been fixed by one who has assumed a partisan affiliation.

Rule 605 should prevent a [judge] witness from testifying in such a case since accuracy and the appearance of impartiality, the central policy goals of that statute, would otherwise be jeopardized.

*Id.*

In this case, the original trial judge fixed the rights of the parties by, *inter alia:* ordering the trials of the medical malpractice claim and tortious interference claim to be severed; inducing the McCools to waive their right to a jury trial by agreeing to personally hear the tortious interference claim as a bench trial; subsequently deciding not to adjudicate the tortious interference claim; overruling the McCools' objection to that decision; and, by denying the McCools' motion for a continuance of the tortious interference claim.

Moreover, following the judge's testimony, the rights of the parties were subject to further adjudication by that same judge—the original trial judge—since the McCools' motion for a new trial remained under advisement. When the motion was ultimately decided, the original trial judge denied the request for a new trial on the malpractice claim. In denying the McCools' motion, notwithstanding having testified on behalf of Dr. Gehret regarding the tortious interference claim, the original trial judge reaffirmed that a severance of the McCools' claims was required to avoid prejudice to Dr. Gehret. This performance of dual roles, as judge and as witness, raises a concern about the *appearance* of impartiality.[9] *Compare In re Estate of Waters,* Del.Supr., 647 A.2d 1091 (1994).

The number of reported cases involving the testimony of a trial judge on behalf of a litigant who had appeared before that judge in a preceding trial are, understandably, few. Such a situation did occur, however, in California approximately twenty years ago. *Merritt v. Reserve Ins. Co.,* 34 Cal.App.3d 858, 110 Cal.Rptr. 511, 527–28 (1974). The *ratio decidendi* and holding of the *Merritt* case are instructive.

In *Merritt,* during a second trial, the judge who had presided at the first trial appeared as an expert witness for the plaintiff. The judge testified that, in the judge's expert opinion, a particular witness at the earlier trial had not been persuasive. The judge's opinion supported the plaintiff's position at the second trial.

Similarly, in this case, the judge who conducted the medical malpractice trial appeared as a witness for Dr. Gehret at the subsequent trial of the tortious interference claim. The original trial judge rendered an opinion that the McCools' expert witness, Dr. Dein, had been an effective witness. That opinion supported Dr. Gehret's position that, even if he had interfered with Dr. Dein, he had not caused the McCools any damage. Opinion testimony by a judge is problematic:[10]

Public policy considerations militate against the trial judge testifying as an expert witness in litigation involving parties who previously appeared before him.

---

**9.** This Court wishes to emphasize that the *actual* impartiality of the original trial judge is not in question. The Texas Supreme Court recently addressed the propriety of a party calling a judge as an expert witness and stated:

Although Canon 2 specifically restricts judges only from testifying as character witnesses, the underlying principles may apply to other judicial testimony, especially expert testimony. A judge who testifies as an expert witness for a private litigant provides more than evidence; the judge also confers the prestige and credibility of judicial office to that litigant's position, just as a judge who testifies to the litigant's character. Expert witnesses, unlike judges, rarely appear impartial; a party does not ordinarily call an expert whose testimony is unfavorable. An expert witness is offered to support a party's position, and if the expert is a judge, the [trier of fact] may mistake that support for an official endorsement.

*Joachim v. Chambers,* Tex.Supr., 815 S.W.2d 234, 238 (1991). Canon 2 of the Delaware Judges' Code of Judicial Conduct is substantially the same.

**10.** This Court finds the analysis regarding the complications of expert judicial testimony equally pertinent to the situation in the present case in which the original trial judge appraised Dr. Dein's effectiveness as a witness.

Ethical mandates governing judicial conduct dictate that a judge should not create the appearance of impropriety. Opinion testimony by a judge creates the appearance of partiality on behalf of a litigant, is greatly prejudicial to the adverse party, and raises the suspicion of judicial favoritism in the prior litigation.

*Phillips v. Clancy,* Ct.App., 152 Ariz. 415, 733 P.2d 300, 306 (1986) (citing R. Mallen & V. Levit, *Legal Malpractice* § 667 (2d ed. 1981)).

In *Merritt,* the court concluded that it was "prejudicial to one party for a judge to testify as an expert witness on behalf of the other party with respect to matters that took place before [the judge] in his judicial capacity." *Merritt v. Reserve Ins. Co.,* 110 Cal.Rptr. at 528. The court observed that in such an instance, "the judge appears to be throwing the weight of his position and authority behind one of two opposing litigants." *Id.* The court noted that the California code of evidence, like Delaware's Rule 605, absolutely prohibits the judge presiding at the trial from testifying as a witness. The court concluded that it was almost as prejudicial to one party for the judge to express an opinion as a witness, in a subsequent proceeding between the same litigants, about events that occurred in an earlier trial over which that judge had presided.

The record reflects that the Superior Court judge's testimony in the tortious interference trial irrevocably compromised the integrity of the judicial process in the entire proceeding between Dr. Gehret and the McCools. *See Joachim v. Chambers,* Tex. Supr., 815 S.W.2d 234, 238–39 (1991). First,

the appearance of impartiality was undermined by the judge's testimony favoring one of the litigants, Dr. Gehret. Second, the adversarial process was impaired when the McCools' attorney was placed in the untenable position of having to cross-examine the original trial judge during the tortious interference trial, while his clients' motion for a new trial of the malpractice claim remained pending before that very jurist.[11] Third, following the judge's testimony, the McCools (and the second trial judge) were placed in a difficult position because the success of their tortious interference claim depended, in large part, upon the second trial judge discrediting his colleague's assessment of Dr. Dein's effectiveness as a witness. In fact, the second trial judge's ultimate conclusion was that "clearly no injury occurred since, in the opinion of the presiding [original trial] judge, Dr. Dein's testimony was very effective."

Delaware Rule of Evidence 605 precludes the presiding judge from testifying "in that trial." This case exemplifies the problems that can arise when a judge has presided over some facet of the proceedings in a case, is subsequently disqualified or leaves the bench for some other reason, and is then called to testify in the same proceeding. Accordingly, we agree with the logic of the learned commentators' analysis that Rule 605 applies to such a situation. Otherwise, the undisputed policy goals of Rule 605; i.e., accurate fact-finding and the appearance of impartiality, are significantly undermined by the two roles the presiding judge occupies in what is fundamentally *one* continuous proceeding. *See* 27 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6063 (1990).[12]

---

11. In *Joachim,* the Texas Supreme Court observed:

> [T]he relationship that develops between a judge and the lawyer who cross-examines him may influence the judge's conduct or judgment in other cases in which the attorney must appear before the judge. The judge, who is accustomed to expect some deference from attorneys, may easily mistake zeal for disrespect and find the experience unforgettable. And the attorney, who is not ordinarily in the posture of interrogating a judge, may be hesitant to attempt to impeach him, even to serve the client's interests.

*Joachim v. Chambers,* 815 S.W.2d at 238.

12. It should be noted that, even if Rule 605 did not apply, there may be policy reasons unconnected with those underlying the rule that may excuse a member of the judiciary from testifying. For example, it is firmly established that a judge, even if competent to testify, may not be asked to testify about his or her mental processes in reaching a judicial decision. *Washington v. Strickland,* 693 F.2d 1243, 1263 (5th Cir.1982), *rev'd on other grounds,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (testimony of state trial judge concerning his reasons for imposing death penalty inadmissible). *Accord Evans v. Justice of the Peace Court No. 19,* Del.Supr., 652 A.2d 574 (1995).

The record reflects that the testimony on Dr. Gehret's behalf by the judge specially assigned to preside at this entire proceeding was contrary to the purpose and policy of Rule 605. We hold that, under the facts of this case, the absolute prohibition of Rule 605 applied. The Superior Court judge's testimony on Dr. Gehret's behalf during one "severed" phase of a proceeding that had been, and would thereafter continue to be, presided over by that same judge was reversible error *per se*. D.R.E. 605; *Merritt v. Reserve Ins. Co.*, 34 Cal.App.3d 858, 110 Cal.Rptr. 511 (1974). *See also Evans v. Justice of the Peace Court No. 19*, Del.Supr., 652 A.2d 574 (1995).

In *Evans*, this Court held that a judge who had imposed a sanction upon an attorney was precluded from appearing as a witness in a subsequent proceeding. *Evans v. Justice of the Peace Court No. 19*, 652 A.2d at 577 (citing *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); *Fayerweather v. Ritch*, 195 U.S. 276, 25 S.Ct. 58, 49 L.Ed. 193 (1904)). This Court stated that such testimony would be "destructive of judicial responsibility and undermine the integrity of the judicial process." *Id.* Independent of the specific *per se* prohibitions set forth in Delaware Rule of Evidence 605 and the context of the specific factual circumstances presented in *Evans*, we note our agreement with the general proposition that:

> Only in the rarest of circumstances should a judge be called upon to give evidence as to matters upon which he [or she] has acted in a judicial capacity, and these occasions, we think, should be limited to instances in which there is no other reasonably available way to prove the facts sought to be established.

**13.** The Sixth Amendment pertains to criminal trials and provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed...." U.S. Const. amend. VI. For a discussion of the history of trial by jury in criminal proceedings in Delaware see *Claudio v. State*, Del.Supr., 585 A.2d 1278 (1991).

**14.** The Seventh Amendment pertains to civil trials and provides that "[i]n Suits at common law, where the value in controversy shall exceed

*State ex rel Carroll v. Junker*, 79 Wash.2d 12, 482 P.2d 775, 781 (1971). *Accord Battle v. Thornton*, D.C. Ct.App., 646 A.2d 315, 325 (1994). *Cf. Gold v. Warden, State Prison*, 222 Conn. 312, 610 A.2d 1153, 1157 (1992).

## DELAWARE CONSTITUTION
## JURY TRIAL IN CIVIL PROCEEDINGS

The McCools contend that forcing them to proceed with a bench trial on their tortious interference claim, despite their objection, violated their Delaware Constitutional right to have a trial by jury in that civil proceeding. The historical origins of the right to trial by jury which is provided for in the Delaware Constitution was reviewed by this Court in *Claudio v. State*, Del.Supr., 585 A.2d 1278 (1991). In *Claudio*, this Court noted that when Delaware adopted its Constitution in 1792, notwithstanding the ratification of the first ten amendments or federal Bill of Rights in 1791, it did not create "a mirror image of the United States Constitution" with regard to trial by jury. *Id.* at 1289.

When the Delaware Constitution of 1792 was adopted, the right to trial by jury set forth in the federal Bill of Rights as the Sixth[13] and Seventh[14] Amendments to the United States Constitution was only a protection against action by the federal government. *Barron v. Mayor of Baltimore*, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833). Following the adoption of the Fourteenth Amendment to the United States Constitution, the Sixth Amendment right to trial by jury in *criminal* proceedings has been deemed to have been incorporated by the Due Process clause and now also provides protection against state action.[15] *Duncan v.*

twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

**15.** For a discussion regarding the incorporation of the federal Bill of Rights into the Due Process Clause of the Fourteenth Amendment, thereby making them applicable to the states, see Richard C. Cortner, *The Supreme Court and the Second Bill of Rights: The Fourteenth Amendment and the Nationalization of Civil Liberties* (1981).

*Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Nevertheless, the United States Supreme Court has not held that the Seventh Amendment's guarantee of jury trials in *civil* proceedings was made applicable to the states by the incorporation doctrine with the adoption of the Fourteenth Amendment to the United States Constitution. *Minneapolis & St. Louis R.R. v. Bombolis,* 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916); *Walker v. Sauvinet,* 92 U.S. 90, 23 L.Ed. 678 (1876).

Accordingly, the right to a jury trial in civil proceedings has always been and remains exclusively protected by provisions in the Delaware Constitution. Delaware adopted its first Constitution in 1776, which provided, in pertinent part:

> The common law of England, as well as so much of the statute law as have been heretofore adopted in practice in this state, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution and the declaration of rights, & c. agreed to by this convention.

Del. Const. of 1776, art. 25, 1 Del.C. at 118. Delaware also adopted its own *Declaration of Rights* in 1776, which guaranteed the right to trial by jury to all citizens of the State of Delaware and included a statement "[t]hat trial by jury of facts where they arise is one of the greatest securities of the lives, liberties and estates of the people." *Declaration of Rights and Fundamental Rules of the Delaware State* § 13 (1776), 1 Del.C. at 110.

When Delaware adopted its next Constitution in 1792, its citizens were guaranteed the right to trial by jury "as heretofore." *See Claudio v. State,* 585 A.2d at 1298. Consequently, since its inception in 1776, the Delaware Constitution has afforded its citizens the right to trial by jury in both criminal and civil proceedings. In doing so, the Delaware Constitution has expressly preserved all of the fundamental features of the jury system as they existed at common law. *Id.*[16] *See also Nance v. Rees,* 52 Del. 533, 161 A.2d 795 (1960).

A *sine qua non* of that common law jurisprudence is the principle that either party shall have the right to demand a jury trial upon an issue of fact in an action at law. As previously noted, the 1776 Delaware *Declaration of Rights,* which was preserved by the "heretofore" text in the 1792 Constitution, referred to the right to trial by jury regarding factual issues as "one of the greatest securities of the lives, liberties and estates of the people."[17] Similarly, in a letter to Pierre S. DuPont, Thomas Jefferson described the fact finding function of jurors as:

> the very essence of a Republic.... We of the United States ... think experience has proved it safer for the mass of individuals composing the society to reserve to themselves personally the exercise of all rightful powers to which they are competent....

> Hence, with us, the people ... *being competent to judge of the facts occurring in ordinary life, ... have retained the functions of judges of facts under the name of jurors....*

> I believe ... that action by the citizens, in person in affairs within their reach and competence, and in all others by representatives chosen immediately and removable by themselves, constitutes the essence of a Republic....

Letter from Thomas Jefferson to Pierre S. DuPont (April 4, 1816), *in* 4 *Annals of America* 414 (Encyclopedia Britannica 1976) (emphasis added). *See* 2 J. Kendall Few, *In Defense of Trial by Jury* 456 (1993).

---

**16.** In 1727, Delaware adopted *An Act of Privilege to a Free Man,* which provided:

> That no free man within this government shall be taken or imprisoned, or disseized of his freehold or liberties, or be outlawed or exiled, or other ways hurt, damnified or destroyed, nor be tried or condemned but by the lawful judgment of his twelve equals, or by the laws of England, and of this government.

1 *Laws of the State of Delaware* 119 (1797).

**17.** John Dickinson, one of Delaware's leading statesmen, called trial by jury a "heaven-taught institution" which was one of the "cornerstones of liberty" and the birthright of every American citizen. John Dickinson, *Letters of Fabius, 1788,* Letter IV, quoted in 1 B. Schwartz, *The Bill of Rights: A Documentary History* 546–50 (1971). *See Claudio v. State,* 585 A.2d at 1292.

In 1855, the Delaware General Assembly enacted a statute that purportedly allowed judges to decide issues of fact without a jury in actions at law, with the agreement of all the parties. 11 Del.Laws, ch. 270. Nevertheless, because the Delaware Constitution preserved the right to trial by jury as "heretofore," Delaware judges took the position that, absent constitutional amendment, the General Assembly could not alter the right by statute. *See* 3 *Debates and Proceedings of the Constitutional Convention of the State of Delaware* 1730 (Milford Chronicle Publishing Co. 1958) (hereinafter *"Constitutional Debates"*). Therefore, notwithstanding the enactment of the 1855 statute by the General Assembly, Delaware judges remained reluctant to decide issues of fact in an action at law because they concluded that the Delaware Constitution required a jury to decide such questions. *Id.* Compare *Seymour v. Swart*, Okl.Supr., 695 P.2d 509 (1985) (similarly interpreting Oklahoma Constitution).

When the present Delaware Constitution was rewritten in 1897, the General Assembly included several significant provisions regarding the right to trial by jury. Article I of the 1897 Delaware Constitution was denominated for the first time as the "Bill of Rights." Section 4 of that article provided for the right to trial by jury as "heretofore." [18] Article IV, Section 19 was a new addition in the 1897 Constitution and provided: "Judges shall not charge juries with respect to matters of fact, but may state the questions of fact in issue and declare the law." Del. Const. art. IV, § 19. The reason given during the Constitutional debates for the adoption of Section 19 was to ensure "that Judges shall confine themselves to their business, which is to adjudge the law and leave juries to determine the facts." 3 *Constitutional Debates* at 1730. *See Storey v. Camper*, Del.Supr., 401 A.2d 458, 463 n. 4 (1979).

In *Storey*, this Court characterized Section 19 as perpetuating Delaware's commitment to trial by jury in civil actions at law with regard to issues of fact. *Storey v. Camper*, 401 A.2d at 462–65. In examining when a trial judge may set aside a jury verdict, this Court described Delaware's long history of commitment to trial by jury. *Id.* We explained that Section 19 reaffirmed Delaware's commitment to the common law principles regarding trial by jury:

> In the policy of the law of this state, declared by the courts in numberless decisions, the jury is the sole judge of the facts of a case, and so jealous is the law of this policy that by express provision of the Constitution the court is forbidden to touch upon the facts of the case in its charge to the jury.

*Id.* at 462 (quoting *Philadelphia, B. & W.R. Co. v. Gatta*, 27 Del. 38, 85 A. 721, 729 (1913)).

In 1897, another new section was added to Article IV of Delaware's Constitution.[19] Article IV, Section 20 provides that, "[i]n civil causes where matters of fact are at issue, if the parties agree, such matters of fact shall be tried by the court, and judgment rendered upon their decision thereon as upon a verdict by a jury." Del. Const. art. IV, § 20. According to the Constitutional debates, the purpose of the new Section was to address the concerns of Delaware's jurists about the constitutionality of the 1855 statutory authorization for litigants to waive a trial by jury in an action at law on an issue of fact.

> WILLIAM C. SPRUANCE: Mr. Chairman, that is new, but it is a provision found in many Constitutions, and it is substantially a restatement of a statute which exists today.

> But the difficulty is, that some of our Judges—very wise and good men though they be—have taken very solemn oaths that they would not try questions of fact.

**18.** That same "heretofore" right had been set forth in all of Delaware's preceding Constitutions since 1792. *See Hopkins v. Justice of the Peace Court No. 1*, Del.Super., 342 A.2d 243, 245–46 (1975).

**19.** The text of Article IV, Section 20 originally appeared as Section 23 in 1897.

They said they would not try questions of fact, even though that was put upon them by the Legislature, that the Legislature had no right to put it upon them; and I know one eminent Judge who said in "nautical" language that he would not do it.

3 *Constitutional Debates* at 1730. *See also Graham v. State Farm Mut. Auto. Ins. Co.,* Del.Supr., 565 A.2d 908, 912 (1989) (explaining that parties to Delaware actions are entitled to request a jury trial, but that they may waive that right if they "so intend").

In this case the McCools specifically demanded a jury trial on their medical malpractice claim and their tortious interference claim.[20] When the jury that heard their medical malpractice claim was discharged, the McCools agreed to waive their right to a jury trial regarding their tortious interference claim only because the original trial judge offered to decide the remaining claim as a bench trial. The record contains the following statement by the McCools' attorney to the second trial judge:

For practical reasons, the [medical malpractice] trial went a bit longer than we expected. Because of the two-week period of the jury panel, [the original trial judge] explained to us that it did not appear we would be able to get the same jury.

Discussing this in chambers as well as I think in the courtroom, ... [the original trial judge] proposed [to personally hear] this count ... [as] a bench trial, [the] benefit being, again, that even though we don't have the jury, at least we have a judge who did have the benefit of hearing all the testimony, ...

When the original trial judge subsequently declined to hear the tortious interference claim, the McCools objected to proceeding with a bench trial before another judge. Their attorney advised the second judge:

Based on our understanding that the matter would be heard on the bench trial before [the original trial judge], my clients and I agreed to have it heard that way rather than [by] jury trial. [I] just want to go on record that is their position. They still are opposed to ... the assignment of your honor.

■ Although a party has no right to insist on a bench trial before a particular judge,[21] the record reflects that the McCools' waiver of their right to a jury trial was, in fact, permitted to be premised upon such a condition. The McCools only waived their right to a jury trial on the condition that the bench trial would be held before the original judge who had heard the medical malpractice claim and was familiar with much of the evidence relevant to the tortious interference claim. When the original trial judge, who had induced the McCools to waive their right to a jury trial, refused to hear their tortious interference claim, the condition upon which the McCools' waiver had been predicated ceased to exist.

This Court has recognized that the right to a trial by jury, as guaranteed by the Delaware Constitution, may be relinquished pursuant to a valid waiver. *Graham v. State Farm Mut. Auto. Ins. Co.,* 565 A.2d at 912. Under the circumstances presented in this case, however, the McCools could not be forced to proceed with a bench trial before a second judge, in the absence of an unconditional waiver of their fundamental right to a trial by jury. *Id. See Federal Deposit Ins. Corp. v. Cafritz,* 770 F.Supp. 28, 30 (D.D.C. 1991). Consequently, the bench trial of the tortious interference claim that proceeded, without the McCools' express and unconditional waiver of a jury trial, violated Article IV, Section 20 and Article I, Section 4 of the Delaware Constitution.

---

**20.** Under Super.Ct.Civ.R. 38(b), the right to a jury trial must be preserved by demanding it on the face of a pleading at the time the action is commenced. The McCools made the required demand in their amended complaint, which added the claim for tortious interference.

**21.** *See Kahn v. General Motors Corp.,* 865 F.Supp. 210 (S.D.N.Y.1994). *See also* Super.Ct.Civ.R. 63.

## CONCLUSION

The judgments of the Superior Court that were entered in favor of Dr. Gehret with respect to the McCools' claims for medical malpractice and tortious interference are REVERSED. This matter is remanded to the Superior Court, where the President Judge should assign it for a new trial in accordance with this opinion. Super.Ct.Civ.R. 40.